UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------- X

CORINNE ARAZI, ROSEANN HYLEMON, and    :    20 Civ. 08837 (GHW) (SDA)
EVELYN JULIA,    :
   :
         Plaintiffs,    :    **THIRD AMENDED**
   :    **COMPLAINT**
     -against-    :    <u>**WITH JURY DEMAND**</u>
   :

COHEN BROTHERS REALTY CORPORATION,    :
   :
         Defendant.    :

------------------------------------------------------------------- X

       Plaintiffs, Corinne Arazi, Roseann Hylemon, and Evelyn Julia, by their counsel, allege as

follows:

<u>**THE NATURE OF THE ACTION**</u>

       1.      Plaintiffs brings this action for: (1) failure to pay overtime in violation of the Fair

Labor Standards Act § 207, <u>et</u> <u>seq.</u> ("FLSA"); (2) failure to pay overtime in violation of the New

York Labor Law §§ 663(1), 12 NYCRR § 142, and 198; (3) failure to pay spread of hours pay

under 12 NYCRR § 142 and New York Labor Law § 198; (4) failure to page wages under New

York Labor Law §§ 191, 193, and 198; (5) failure to provide proper notice in violation of New

York Labor Law §§ 195(1) and 198; (6) failure to provide proper wage statements in violation of

New York Labor Law §§ 195(3) and 198; (7) gender-based hostile work environment/sexual

harassment in violation of the Administrative Code of the City of New York § 8-101, <u>et</u> <u>seq.</u> ("New

York City Human Rights Law"); (8) gender-based hostile work environment/sexual harassment in

violation of the New York State Executive Law § 296, <u>et</u> <u>seq.</u> ("New York State Human Rights

Law"); (9) retaliation in violation of New York Labor Law § 740; (10) disability/perceived

disability/associational disability discrimination and failure to engage in an interactive process and

give reasonable accommodations in violation of the New York City Human Rights Law; (11)

disability/perceived disability/associational disability discrimination and failure to engage in an interactive process and give reasonable accommodations in violation of the New York State Human Rights Law; (12) retaliation in violation of the FLSA, 29 U.S.C. § 215 (a)(3); (13) retaliation in violation of the New York Labor Law § 215; (14) retaliation in violation of the New York City Human Rights Law; and (15) retaliation in violation of the New York State Human Rights Law.

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction over this action under § 29 U.S.C. § 1331, and the principles of supplemental jurisdiction under 28 U.S.C. § 1367.

3.      Venue is proper under 28 U.S.C. §§ 1391(b)(2), as the Southern District of New York is the judicial district in which a substantial part of the events giving rise to Plaintiff's claims occurred.

## THE PARTIES

4.      Plaintiff Corinne Arazi was employed by Defendant Cohen Brothers Realty Corporation ("Cohen Brothers") out of its office at 750 Lexington Avenue, 28th Floor, New York, New York 10022.

5.      Plaintiff Roseann Hylemon was employed by Defendant Cohen Brothers out of its office at 750 Lexington Avenue, 28th Floor, New York, New York 10022.

6.      Plaintiff Evelyn Julia was employed by Defendant Cohen Brothers out of its office at 750 Lexington Avenue, 28th Floor, New York, New York 10022.

7.      Defendant Cohen Brothers is a private real estate development and management firm.  The President and CEO, Charles S. Cohen, is listed on Forbes 400's list of wealthiest Americans.

## FACTS

## OVERTIME, SPREAD OF HOURS, & WAGE CLAIMS

### Corinne Arazi

8.      Ms. Arazi commenced employment with Cohen Brothers on December 5, 2016 as an Executive Assistant.

9.      Ms. Arazi was paid by a starting salary of $90,000, and received raises to $95,000 on December 9, 2017, to $100,000 on December 15, 2018, and to $110,000 on December 14, 2019. She was also paid a bonus of $10,000 at the end of 2019.

10.      Ms. Arazi's last day in which she worked prior to being furloughed was March 13, 2020.

11.      Ms. Arazi was originally hired to be one of two Executive Assistants to the President and CEO, Charles S. Cohen, along with Rosemary Pacheco.  Mr. Cohen had had multiple Executive Assistants prior to Ms. Arazi's hire as well.  Ms. Arazi replaced another Executive Assistant named Dominique Demonchaux.

12.      On April 6, 2018, Ms. Pacheco's employment was terminated.

13.      Subsequently, Ms. Arazi performed the workload of two executive assistants, as Ms. Pacheco was not replaced.

14.      During her second week of work in December 2016, when Ms. Arazi asked the Chief Operating Officer ("COO"), Steven M. Cherniak, what her hours were, he answered:  "there are no hours on this side of the wing," meaning the executive offices, meaning they did not have set hours and worked long hours.

15.     From December 5, 2016 to April 6, 2018, Ms. Arazi worked an average of approximately 55 hours per week in the office, in addition to 9 hours during early mornings and late evenings and on weekends, for a total of approximately 64 hours per week.

16.     From December 5, 2016 to April 6, 2018, Ms. Arazi's typical hours were:

    a)  Mondays 7:15 a.m. to 7:30 p.m. (12.25 hours) in the office when Mr. Cohen was in the office, and 8:30 a.m. to 6:15 or 6:30 p.m. (9.75-10 hours) in the office when Mr. Cohen was traveling, plus handling emails for approximately 30 minutes (.5 hours) prior to arriving at the office, and handling emails for approximately 30 minutes (.5 hours) after leaving the office;

    b)  Tuesdays-Thursdays 8:30 a.m. to 7:30 p.m. (11 hours/day) in the office when Mr. Cohen was in the office, and 8:30 a.m. to 6:15 or 6:30 p.m. (9.75-10 hours/day) in the office when Mr. Cohen was traveling or working from home (as he did on Fridays), plus handling emails for approximately 30 minutes (.5 hours/day) prior to arriving at the office, and handling emails for approximately 30 minutes (.5 hours/day) after leaving the office;

    c)  Fridays 8:30 a.m. to 6:00 p.m.-6:30 p.m. (9.5-10 hours) in the office (Mr. Cohen rarely came to the office on Friday and instead worked from his home in Connecticut);

    d)  Saturdays-Sundays approximately 4 hours (she handled emails on weekends and sometimes worked in the office).

17.     From April 7, 2018 to March 13, 2020, Ms. Arazi worked an average of approximately 55 hours or more per week in the office, in addition to 9 hours during early mornings and late evenings and on weekends, for a total of approximately 64 hours per week.

18.     From April 7, 2018 to March 13, 2020, Ms. Arazi's typical hours were:

a)  Mondays 7:00 a.m. to 7:00 p.m.-7:30 p.m. (12-12.5 hours) in the office when Mr. Cohen was in the office, and 8:15 a.m. to 6:30 p.m.-6:45 p.m. (10.25-10.5 hours) in the office when Mr. Cohen was traveling, plus handling emails for approximately 30 minutes (.5 hours) prior to arriving at the office, and handling emails for approximately 30 minutes (.5 hours) after leaving the office;

b)  Tuesdays-Thursdays 8:15 a.m. to 7:00 p.m.-7:30 p.m. (10.75-11.25 hours/day) in the office when Mr. Cohen was in the office, and 8:15 a.m. to 6:30 p.m. or 6:45 p.m. (10.25-10.5 hours/day) in the office when Mr. Cohen was traveling or working from home (as he did on Fridays), plus handling emails for approximately 30 minutes (.5 hours/day) prior to arriving at the office, and handling emails for approximately 30 minutes (.5 hours/day) after leaving the office;

c)  Fridays 8:15 a.m. to 6:00 p.m.-6:30 p.m. (9.75-10.25 hours) in the office (Mr. Cohen rarely came to the office on Friday and instead worked from his home in Connecticut);

d)  Saturdays-Sundays approximately 4 hours (she handled emails on weekends and sometimes worked in the office).

19.     Ms. Arazi was not given lunch breaks, but rather ate while working.

20.     Ms. Arazi was generally not allowed to leave the office at the end of the work day until Mr. Cohen left the office.

21.     The above times are estimates.

22.     Ms. Arazi clocked in and out of the office during weekdays using the time clock in the lobby of the office building, and sometimes when she worked on weekends.  Cohen Brothers (including Human Resources, Property Manager Jan Blaha, and Mr. Cherniak) possesses records of the hours she worked while she was clocked in -- those records do not include the time she worked outside of the office before and after working at the office on weekdays or on weekends mainly handling emails, as well as some of her time worked in the office on weekends.

23.     Cohen Brothers erroneously classified Ms. Arazi as exempt.

24.     Cohen Brothers failed to pay Ms. Arazi overtime pay for her hours worked over 40 hours per week.

25.     Cohen Brothers failed to pay Ms. Arazi spread of hours pay for workdays on which her start time and end time were more than 10 hours apart.

26.     Even though Ms. Arazi was only paid through April 7, 2020, and was told she could not work from home and would not be paid unless she came to the office, Cohen Brothers (including Mr. Cohen and Mr. Cherniak) continued to ask her to perform work by email.  And Ms. Arazi performed such work intermittently through April 30, 2020.

27.     However, Ms. Arazi was not paid for such work.

28.     Ms. Arazi therefore should have been paid her $110,000 salary from April 8-30, 2020.

**Roseann Hylemon**

29.     Ms. Hylemon was the Executive Assistant to the President and CEO Mr. Cohen from March 14, 2014 to March 2016, and then was the Executive Assistant to the COO Mr. Cherniak starting in March 2016.

30.     Ms. Hylemon's last day in which she worked prior to being furloughed was March 13, 2020.

31.     Ms. Hylemon was paid a starting salary of $85,000, and receives raises to $90,000 in 2015, $93,000 in 2016, $98,000 in 2018, and $103,499.76 in 2019.

32.     From March 14, 2014 to March 2016, when Ms. Hylemon was Executive Assistant to Mr. Cohen, she worked an average of approximately 66.5-71.5 hours per week.

33.     From March 14, 2014 to March 2016, Ms. Hylemon's typical hours in the office were 7:00-7:30 a.m. to 7:00-7:30 p.m. Monday-Friday (11.5-12.5 hours/day), plus she also handled emails for approximately 30 minutes (.5 hours/day) prior to arriving at the office, and handled emails for approximately 30 minutes (.5 hours/day) after leaving the office.  On weekends, she handled emails and sometimes spoke to Mr. Cohen for approximately 4 hours.

34.     From March 14, 2014 to March 2016, Ms. Hylemon was not given lunch breaks, but rather ate while working.

35.     From March 2016 to March 13, 2020, when Ms. Hylemon was Executive Assistant to Mr. Cherniak, she worked an average of approximately 44.5 hours per week.

36.     From March 2016 to March 13, 2020, Ms. Hylemon's typical hours were 8:30 a.m. to 5:30 p.m. Monday-Friday during which she took a one-hour lunch each day (8 hours per day). She also handled emails prior to arriving at the office and after leaving the office (.5 hours/day). On weekends, she handled emails and sometimes calls for approximately 2 hours.

37.     Ms. Hylemon clocked in and out of the office during weekdays using the time clock in the lobby of the building, except those records do not include the time she worked outside of the office before and after working at the office on weekdays or on weekends mainly handling emails.

38.     Cohen Brothers erroneously classified Ms. Hylemon as exempt.

39.     Cohen Brothers failed to pay Ms. Hylemon overtime pay for her hours worked over 40 hours per week.

40.     Cohen Brothers failed to pay Ms. Hylemon spread of hours pay for workdays on which her start time and end time were more than 10 hours apart.

**Evelyn Julia**

41.     Ms. Julia worked at Cohen Brothers as a Senior Showroom Leasing Administrator starting November 5, 2018.

42.     Ms. Julia's last day in which she worked prior to being furloughed was March 18, 2020.

43.     Ms. Julia was paid a starting salary of $78,000, and received a raise to $83,000 effective on approximately November 15, 2019.

44.     From November 5, 2018 to March 18, 2020, Ms. Julia typically worked an average of approximately 42.5 hours per week.

45.     Ms. Julia's typical hours were 9:00 a.m. to 6:00 p.m. Monday-Friday, with a 1-hour lunch break.  However, she often worked through lunch or for a portion of her lunch hour.

46.     Cohen Brothers erroneously classified Ms. Julia as exempt.

47.     Cohen Brothers failed to pay Ms. Julia overtime pay for her hours worked over 40 hours per week.

48.     From April 1, 2020 through May 1, 2020, while home and not being paid her salary because of Cohen Brothers' supposed no work from home policy and because her paid time off had run out, Ms. Julia nevertheless was still working many hours per day assisting her direct supervisor, Stephen Fredericks, Senior Vice President, National Leasing Director for Cohen

Brothers.  She was assisting him with some leasing tasks and monitoring emails being sent to her by the Accounting Department with questions, and also monitoring emails from Mr. Cherniak to and from tenants in Cohen Brothers buildings.

49.     Ms. Julia therefore should have been paid $6,916.67 for one month of her $83,000 salary for her work in April 2020.

## GENDER-BASED HOSTILE WORK ENVIRONMENT/SEXUAL HARASSMENT

50.     Throughout her employment by Cohen Brothers, Ms. Julia -- who starting working at Cohen Brothers on November 5, 2018 -- has continually suffered from various unwelcome instances of sexual harassment by her direct supervisor, Mr. Fredericks, Senior Vice President, National Leasing Director for Cohen Brothers.

51.     For example, Mr. Fredericks constantly made comments about Ms. Julia's appearance, such as the following.

   a.  "Oh my God, you are a bombshell,"

   b.  "How are you not taken, you're such a catch,"

   c.  "I can probably set you up with one of my very successful friends, but no, I don't think that would be a good idea, I just don't think they could handle you."

   d.  "Wow, you look so hot today."

   e.  Depending on how Ms. Julia would wear her hair, Mr. Fredericks would make comments like the following.

      i.  "You look so hot with that hair today, you remind me of Morticia Adams."

      ii.  "You are just such a gorgeous woman."

52.     Mr. Fredericks on multiple occasions asked Ms. Julia to come into his office and then discussed inappropriate personal and sexual subjects.  For example, he would say he wanted

to talk or "catch up on your life," or say "come tell me what's going on with you," but then tell Ms. Julia about his sexual history, bragging about how he was such a virile man in his youth and never had a problem with women or having sex, and how many sexual encounters he had in the past.

53.  Ms. Julia would get up to go back to her desk and say to Mr. Fredericks, "okay I think that was a little much and not very appropriate."

54.  Mr. Fredericks would reply, "well, we have gotten to know each other very well with your time here and I consider you a good friend."

55.  Mr. Fredericks also regularly and inappropriately inquired about Ms. Julia's love life.  If he found out that Ms. Julia was going on a date or got ready for a date after work, he commented that she was "all dolled up" and wanted details about her upcoming or recent date.

56.  Ms. Julia refused, saying to Mr. Fredericks "I don't talk about my love life or my dating."

57.  Ms. Julia was told by various employees of Cohen Brothers that when she would walk away, they would catch Mr. Fredericks looking at parts of her body such as her buttocks in a leering, sexual way and then would look away when he realized they or others were noticing what he was doing.

58.   Mr. Fredericks also physically touched Ms. Julia in inappropriate and unwelcome ways.

    a.  When Mr. Fredericks left for long trips or a vacation, he typically said good-bye to Ms. Julia and came by surprising Ms. Julia behind her desk and planted a kiss on her cheek very quickly so that she would not have time to react.

b.  Mr. Fredericks often came to see something behind Ms. Julia's desk or on her computer and put his hands on her shoulders.  She would say "that's a little too close."

59.  In approximately February 2020, Ms. Julia was going to lunch and Mr. Fredericks got in the elevator with Ms. Julia.  In the front of the building, there is a revolving door with partitions.  Ms. Julia entered one of the compartments to exit, and Ms. Fredericks jumped in that same compartment right behind Ms. Julia even though it was meant for one person, instead of taking the next compartment.  Ms. Julia was startled, and as she exited, turned around to question Mr. Fredericks as to why he did that, but he walked away, acting like what he had just done was normal and saying "have a good lunch Eve."

60.  When Ms. Julia came back up from lunch, she immediately told Ms. Hylemon and Milagros ("Millie") Massa, another employee of Cohen Brothers, what she had just experienced with Mr. Fredericks and expressed her shock that he had done that.

61.  Ms. Julia also told Ms. Hylemon about many of the incidents of sexual harassment of her by Mr. Fredericks.  Ms. Julia expressed her shock and disgust to them at the things Mr. Fredericks did.  She asked them if they agreed the incidents were sexual harassment, and they did.

62.  Ms. Hylemon also witnessed much of the sexual harassment of Ms. Julia by Mr. Fredericks, as she sat next to Ms. Julia and the office walls and doors are see-through glass.

63.  The paralegal Ms. Julia replaced, Diane Sullivan, filed a complaint or threatened to do so against Cohen Brothers for sexual harassment by Mr. Fredericks.  That matter was settled.

64.  Ms. Julia was told about that sexual harassment claim by another paralegal who was employed at Cohen Brothers at the time, Jason Marquez.  Mr. Marzquez advised Ms. Julia to be careful.

65.     Ms. Julia told Mr. Marquez about many of the incidents of sexual harassment of her by Mr. Fredericks when they went out for lunch on occasion.

66.     Shortly after Cohen Brothers settled Ms. Sullivan's sexual harassment claims, Cohen Brothers emailed employees notifying them that they needed to complete a sexual harassment course and upon completion print the certificate to keep in the employee's file.

67.     On information and believe, the management of Cohen Brothers, including Mr. Fredericks, neither was sent this email not completed the sexual harassment course.

68.     Ms. Julia also experienced sexual harassment by David Fogel, Senior Vice President at Cohen Brothers.  In the summer of 2019, Ms. Julia changed her hair color from blonde to red.  Mr. Fogel approached her and startled her by saying in a very low voice practically in her ear, "I just have to tell you that that hair color is just driving me crazy," and then walked into his office.

69.     In 2019, Ms. Arazi witnessed the CEO Charles Cohen's wife, Clodagh "Clo" Cohen (who is employed by Cohen Brothers or a related entity as an employee or consultant), in one of her not uncommon uncontrolled screaming rages when she complained about her husband to the COO Mr. Cherniak and Marc Horowitz (Senior Vice President and National Director of Leasing), while in the conference room next to Ms. Arazi's desk.  Among other things, Ms. Cohen swore loudly "no more blowjobs" for her husband in retaliation for his lowering her personal allowance.

70.     Both Mr. Cherniak and Mr. Horowitz came back to talk to Ms. Arazi about this incident and it was extremely uncomfortable.

     a.     Mr. Horowitz came back to Ms. Arazi's office later and asked her if she had heard what was going on in there and the "blowjob" discussion.  Ms. Arazi's said that she

had and that it was highly embarrassing.  Ms. Horowitz said that he had heard much worse over the years at the company and that Mr. Cohen and Ms. Cohen are both "crazy."

    b.  Mr. Cherniak came back to Ms. Arazi's office later in the day asking jokingly what was that about, and that he would not have time to deal with "blowjob talks" in his busy schedule.

71.     Ms. Hylemon and Ms. Julia heard Ms. Cohen's screaming from the other side of the glass door.  Ms. Arazi called Ms. Hylemon after the incident to let her know what had just happened in that room, and how upsetting it was.

72.     The CEO Mr. Cohen, for whom Ms. Arazi was Executive Assistant, and for whom Ms. Hylemon worked directly as Executive Assistant from March 2014 to March 2016 and thereafter worked indirectly (as she reported directly to Mr. Cherniak) and still interacted with in person, has a longstanding reputation for verbally abusing, screaming at, berating, belittling, and humiliating employees, particularly at female employees including Ms. Arazi and Ms. Hylemon, often in front of other employees, creating a hostile work environment and a culture of fear at the office, and withholding praise.

73.     And in fact Mr. Cohen treated female employees, including but not limited to Ms. Arazi and Ms. Hylemon, substantially worse than male employees, in ways consistent with his reputation and in the ways described below, among other things.

74.     Mr. Cohen also exhibited a pattern of treating other women worse than males in ways that created a gender-based hostile work environment, including that resulted in legal claims.

75. After long days of screaming at Ms. Arazi, Mr. Cohen would sometimes say to her as he was leaving the office, "thank you for putting up with me, I will see you early tomorrow morning" or words to that effect.

76. Ms. Hylemon and Ms. Julia heard many of these episodes in which Mr. Cohen raged at Ms. Arazi since their desks were right next to the glass door separating Mr. Cohen's office from the offices of Ms. Arazi and everyone else.

77. Other employees heard Mr. Cohen yelling at Ms. Arazi too, even at the other end of the corridor. Employees sometimes called Ms. Arazi and said that they had documents for Mr. Cohen to sign, but were so afraid to go past that glass door that they would beg Ms. Arazi to pick up the documents from them somewhere in the corridor and call them after Mr. Cohen had signed the documents and left the office.

78. Mr. Cohen also screamed at Ms. Arazi and Ms. Hylemon (both while she worked directly for Mr. Cohen, and while she worked directly for Mr. Cherniak but covered for Ms. Arazi) not to leave their desks while working for him. This was particularly the case and painful regarding bathroom breaks. Ms. Arazi was told that when she wanted to go to the bathroom, she had to let him know and ask him for permission. This was humiliating.

79. If Ms. Arazi ran for a quick bathroom trip when Mr. Cohen was in a conference room or on the phone such that he was not available to grant permission, forwarding her calls to either Ms. Hylemon or the receptionist, and Mr. Cohen happened to need her during those five minutes, he would scream at her upon her return that she was not supposed to leave her desk without his permission.

80. Similarly, when Mr. Cohen was away from the office, he demanded that Ms. Arazi and Ms. Hylemon (both while she worked directly for Mr. Cohen, and while she worked directly

for Mr. Cherniak but covered for Ms. Arazi) stay at their desks at all time to take calls from or to him.  If Ms. Arazi ran for a quick bathroom trip, forwarding her calls to either Ms. Hylemon or the receptionist, and Mr. Cohen happened to call her during those five minutes, he would leave an angry message with the receptionist for Ms. Arazi to call him back asap, or not to call him because he would call back when convenient for him.   Mr. Cohen would also either say "shit" to the receptionist upon learning Ms. Arazi was momentarily not available, or even send the receptionist into the bathroom to ask Ms. Arazi to go back to her desk to take his call.

81.     When Ms. Hylemon walked away from her desk to get water, Mr. Cohen would scream her name all across the office.  He would yell words such as "Why are you away from your desk?!  You aren't supposed to get up!"

82.     When Mr. Cohen called Ms. Hylemon from the conference room asking her to come in, he would bark "Hurry up, you are walking too slow!"  This occurred both before and after Ms. Hylemon worked directly for Mr. Cohen.

83.     At one of the company's Christmas parties that Ms. Hylemon organized, Mr. Cohen screamed at her, "Why did you give the band the fucking check?!"  Ms. Hylemon organized the company's Christmas parties every year she worked at Cohen Brothers, and invariably Mr. Cohen would find something to yell at Ms. Hylemon about.  Mr. Cohen even insulted Ms. Hylemon to her then boyfriend, now husband, at one of the Christmas parties.

84.     On another occasion, when Ms. Hylemon ordered Mr. Cohen cheese on his hamburger, he threw a tantrum, yelling "I don't eat cheese!"

85.     Many times, Mr. Cohen said to Ms. Hylemon "I'm going to kill you" when she did something that did not please him.  This occurred both before and after Ms. Hylemon worked directly for Mr. Cohen.

86.     In another instance, Mr. Cohen ranted at Ms. Hylemon blaming her for something that was not her fault.  She took her things and walked out on him while he was screaming.  As she was walking on Lexington Avenue, she realized that she needed the job.  She was not married at the time and had 2 kids in college, so she went back upstairs.

87.     Mr. Cohen treated female job candidates different than male job candidates.  When interviewing a woman, Mr. Cohen often asked if the woman was married, whether she had children, how old her children were, who would care for her children if she came to work at Cohen Brothers, and where she lived.  Mr. Cohen would not ask these questions of male job candidates.

88.     Mr. Cherniak commented many times after Mr. Cohen interviewed a female job candidate that Mr. Cohen was always asking the wrong questions and was going to get the company in trouble, and that he had told this to Mr. Cohen many times.

89.     As a result of the gender-based hostile work environment Mr. Cohen created, Ms. Hylemon switched jobs within the company and went to work for Mr. Cherniak in March of 2016.

90.     However, Ms. Hylemon continued to have to do some work for Mr. Cohen, and he continued to yell at her and create a gender-based hostile work environment, including but not limited to in the ways described above.

91.     Ms. Julia, who started at Cohen Brothers in November 2018, witnessed much of Mr. Cohen's abuse of Ms. Hylemon.

92.     Ms. Julia spent a substantial amount of time trying to soothe Ms. Hylemon when Ms. Hylemon was upset and distressed due to such abuse by Mr. Cohen.

93.     Ms. Hylemon was also subjected to a hostile work environment created by Mr. Cherniak.

94.     Mr. Cherniak frequently told dirty jokes to Ms. Hylemon and Ms. Julia.  He often came to their desks to make jokes with sexual undertones.  He would then comment that he shouldn't have said that, recognizing that what he said was inappropriate and created a gender-based hostile work environment.

95.     After Mr. Cherniak made such inappropriate sexual jokes, Ms. Hylemon and Ms. Julia often discussed how inappropriate they were and why would Mr. Cherniak say such inappropriate things to them.

96.     Mr. Cherniak often made jokes involving the word gumara, Italian-American slang for married man's mistress.

97.     Ms. Hylemon was frequently berated by Mr. Cherniak.

98.     In contrast, Mr. Cherniak did not berate male employees.

99.     This environment was very stressful and toxic for Ms. Arazi, Ms. Hylemon, and Ms. Julia.  Ms. Hylemon in particular often ended up crying.

**COVID-19-RELATED DISCRIMINATION AND RETALIATION**

100.    On March 4, 2020, Ms. Julia showed Mr. Cherniak an email she had received from First Service Residential (which is a client and tenant of Cohen Brothers) regarding its plans to keep residents of her apartment building safe from the pandemic.  He told her to forward the email to Veronica Olmo, Head of Human Resources.  Ms. Julia did so, but received no response.

101.    On March 8, 2020, Ms. Hylemon sent her supervisor Mr. Cherniak a text regarding Richard Cohen.  Richard Cohen was traveling back from the United Kingdom, where COVID-19 cases were on the rise, to New York.  Ms. Hylemon sent Mr. Cherniak a news article about rising COVID-19 cases in the U.K. and wanted to make sure that Richard Cohen self-quarantined before

returning to Cohen Brothers' New York office.  Mr. Cherniak responded, "I'm on it. Thx," but allowed Richard Cohen to return to the New York office on March 9, 2020.

102.    Around this time, plaintiffs learned that another Cohen Brothers employee, Jeff Hunter, had been in the building in Westchester in which a man had died from COVID-19. Nevertheless, Mr. Hunter was allowed to walk around the common areas of Cohen Brothers New York offices.

103.    During the week of March 9-13, 2020, there emails between James Dunn, the Cohen Brothers Westchester office Building Manager, and Mr. Cherniak regarding a possible case of Covid-19 within one of Cohen Brother's tenants in the Westchester office.  Cohen Brothers management including Mr. Cherniak was trying to keep this a secret rather than warning its Westchester office employees to protect them.

104.    Cohen Brothers continued to have clients and vendors come in to the Manhattan office for meetings throughout that week.

104.    Cohen Brothers did not provide any supplies to employees to protect them from the pandemic, such as anti-bacterial soap.  Employees had to buy their own.

105.    Ms. Julia asked the receptionist at Cohen Brothers' New York offices more than once if hand sanitizer and anti-bacterial soap were going to be ordered for the office, and the receptionist said no.

106.    Ms. Hylemon and Ms. Julia started to taking precautions in the New York office and supplied themselves with disinfectant wipes, hand sanitizer, and gloves.

107.    Executives of Cohen Brothers including Mr. Cherniak and Mr. Horowitz laughed at Ms. Hylemon, and said "This is just the flu.  You are taking this way too serious."

108.    On March 11, 2020, Mr. Cherniak sent Ms. Hylemon a text of Dr. Drew on YouTube criticizing the media's coronavirus coverage.  Ms. Hylemon responded by texting, "Oh so you think I'm over reacting."

109.    Due to the lack of action by Cohen Brothers and lack of response by Ms. Olmo of Human Resources to her emails, Ms. Julia took it upon herself to post CDC posters she had found on its website in the office in the kitchen/copy room area, as well as on her desk and Ms. Hylemon's desk.

110.    Ms. Julia and Ms. Hylemon were mocked and made fun of for this by Mr. Cherniak, Mr. Horowitz, Mr. Fogel, Mr. Hunter, Stephanie Waller, and Helen Figueroa, and were called "overreactors," told "it's not that bad, and told "it will blow over and it's probably all fake news.

111.    On or about March 10, 2020, Ms. Waller, another employee of Cohen Brothers, came behind Ms. Julia's desk to show her something on her phone.  Ms. Julia politely asked her to maintain social distancing, saying "Mama, I love you dearly, but please let's keep our distance for COVID."  Ms. Hylemon witnessed this interaction.

112.    Ms. Waller proceeded to start a smear campaign against Ms. Julia to other employees, saying Ms. Julia was rude and an exaggerator of the pandemic.  Ms. Waller and Ms. Figueroa also gave Ms. Julia dirty looks, and made comments loudly so that Ms. Julia could hear that "it's the people that are being so overreactive to this whole pandemic thing that is making everyone nervous."  Ms. Hylemon witnessed much of this.

113.    On March 11, 2020, Ms. Julia emailed to Human Resources the CDC's Interim Guidance for Cleaning and Disinfection for Public and Private facilities for COVID-19, but again received no response.

114.    On March 12, 2020, New York City Mayor Bill de Blasio declared a state of emergency in New York due to the COVID-19 coronavirus pandemic.

115.    On March 12, 2020, Ms. Julia overheard Mr. Cohen shouting to other Cohen Brothers executives how it was ridiculous how the news was portraying the pandemic and that there is no way it is as bad as the news says it is.  She also overhead Mr. Cohen yell to Ms. Arazi, who was sitting at her desk, "we have to be a soldier and soldier on, right Corinne?"

116.    Friday, March 13, 2020 was the last day on which Ms. Arazi and Ms. Hylemon worked physically in Cohen Brothers' New York offices.

117.    On March 14, 2020, Mr. Cohen, his wife, and their two children flew on their private plane from their home in Greenwich, Connecticut to their apartment in Palm Beach, Florida to try to escape the pandemic that was more prevalent in New York City at the time.

118.    Meanwhile, Cohen Brothers made every effort to require non-executive, rank-and-file employees such as Ms. Arazi, Ms. Hylemon, and Ms. Julia to continue to come to the office in Manhattan to work, barring them from working remoting like Mr. Cohen.

119.    On March 15, 2020, Ms. Hylemon emailed to Mr. Cherniak and Human Resources her doctor's note advising that Ms. Hylemon should not travel into the office Manhattan because her immune system was compromised due to Multiple Sclerosis (MS).

120.    Ms. Hylemon's doctor was Sylvia Klineova, Assistant Professor of Neurology at the Corinne Goldsmith Dickinson Center For Multiple Sclerosis at Mount Sinai Medical Center.

121.    MS is a disease in which the immunological and neurological systems are impaired and not functioning normally.

122.    At that time, the medical community believed that people with MS, an autoimmune disease, were at higher risk for COVID-19 due to their condition.

123.    Currently, the medical community believes that people with progressive MS, like Ms. Hylemon, are more susceptible to having a severe case of COVID-19.

124.    Ms. Hylemon is expected to start taking a medication soon that the medical community believes also increases the chance of having a more severe form of COVID-19.

125.    Neither Mr. Cherniak nor Human Resources responded to Ms. Hylemon's request for a reasonable accommodation of working from home.

126.    On March 15, 2020, since Cohen Brothers was requiring employees to come to the office, Ms. Julia notified Mr. Fredericks that she would begin walking to the Manhattan office from her home in Bushwick, Brooklyn and back, which took about 3 hours each way, to avoid the subways during the pandemic.

127.    On March 16, 2020, Ms. Hylemon called Mr. Cherniak and left him a voicemail, but Mr. Cherniak did not respond.  She then texted him later in the morning telling him that she had just called him and asked him if he saw her email from the night before.  His response was, "Yes. In staff meeting."  Ms. Hylemon texted him "You did not answer.  I have a doctor's note.  My immune system is compromised due to the MS.  If you think I'm not there, just because. Then you are completely wrong."

128.    From that point on, Mr. Cherniak left Ms. Hylemon off email correspondence.

129.    On March 16, 2020, Ms. Arazi sent an email to Mr. Cohen, Mr. Cherniak, Human Resources, and reception.  Ms. Arazi took a sick week as she was suffering from flu-like symptoms, and choose to self-quarantine and stay home in accordance with the State of Emergency declared by Mayor de Blasio on March 12, which said, "If you feel sick, stay home," and her doctor's advice.  She mentioned following "doctor and government requests" in her email.

130.    Ms. Arazi also mentioned in her email that her partner, Jonathan Nadler, was feeling sick and working from home too.

131.    In her email, Ms. Arazi offered to work from home, writing "Should this option (working from home) become available at our office, I would be more than happy and willing to help from home and relieve the load of work on everyone else asap."

132.    On March 16, 2020, Mr. Cherniak sent an email to all employees offering a) no-cost parking, and b) carpooling to have all employees come to work at the office -- evincing a total lack of regard for the health danger of failing to social distance by at least 6 feet, which is not possible in a carpool.

133.    Mr. Cohen's son Ross Cohen, an employee of Cohen Brothers, had sent an email to all of the executives that he would be working from home since he had late stages of Lyme disease and could not be exposed to the coronavirus.  Mr. Cohen was outraged at this and told his son that there was no work from home policy.  Mr. Cohen was in Mr. Cherniak's office with Mr. Cherniak and Mr. Horowitz telling them how Ross was a coward and told them to shut off his phone and get his work from his office.  Mr. Cherniak and Mr. Horowitz retrieved Ross's files and brought them back to Mr. Cherniak's office smiling and laughing saying to Mr. Cohen, "here it is, we got it."  Ms. Julia overheard these conversations.

134.    On March 17, 2020, Cohen Brothers Human Resources sent an email to employees advising them to maintain a positive attitude and be mindful of their conversations and tone around co-workers.  This appeared to be directed at plaintiffs' expressions of concern about the coronavirus and the company's lack of any practices designed to protect employees.

135.    In that same email, Human Resources stated that the company had "no work from home policies…stay home permitted when using sick, personal or vacation time…beyond without pay…."

136.    On March 18, 2020, Ms. Hylemon emailed Human Resources that she would be using her vacation days.

137.    On March 18, 2020, Ms. Hylemon texted Mr. Cherniak "Hi Steve, I am watching the news.  This just came up.  Cuomo signed the executive order."  She attached a screen shot of New York Governor Andrew Cuomo's mandate reducing the non-essential workforce by 50%. Mr. Cherniak did not answer.  Ms. Julia, who was still in the office, saw that Mr. Cherniak called in another executive, Mr. Horowitz, and showed him Ms. Hylemon's text message on his phone, and said, "what, am I supposed to believe a text message?"   Mr. Cherniak and the other executive laughed, and said it was "fake news."  Cohen Brothers never complied with the order to reduce the workforce.

138.    Wednesday, March 18, 2020, was the last day on which Ms. Julia worked physically in Cohen Brothers' New York offices.

139.    On March 19, 2020, Ms. Arazi texted Mr. Cherniak, informing him that she still had flu symptoms, that Mr. Nadler had pneumonia and a cough and was tested for COVID-19 and awaiting results, and that therefore they had to continue to self-quarantine.

140.    On March 19, 2020, with the pandemic intensifying in New York City, Mr. Cohen, his wife, and their two sons fly on their private plane from Palm Beach, Florida to Antigua in the Caribbean and boarded their private yacht that cost $70 million to try to escape the pandemic.

141.    On March 19, 2020, Governor Cuomo issues an order mandating that businesses reduce their non-essential workforce by 50%.

142.    Meanwhile, while Cohen Brothers flouted Governor Cuomo's order, executives like Mr. Cohen and Mr. Cherniak generally worked from home.

143.    Meanwhile, on March 19, 2020, four employees at Cohen Media Group, an entity related to Cohen Brothers, were furloughed.  Two of them, Josh Kappraff and Natalie Kaczinski, had requested to Mr. Cohen less than a week prior to being furloughed to be allowed to work from home, and been denied.  Mr. Kappraff had asked in his email to Mr. Cohen that the staff be allowed to work from home to comply with the pandemic-related New York State ban on gatherings of 500 or more people, which was not possible commuting on public transportation.  Ms. Kaczinski had requested the ability to work from home due to an immune system deficiency that made her particularly vulnerable to the coronavirus.

144.    On information and belief, Mr. Kappraff was furloughed in retaliation for seeking to work from home in compliance with public health and safety orders.

145.    On information and belief, Ms. Kaczinski was denied a reasonable accommodation for her disability, and her furlough was discriminatory based on her disability and retaliation for seeking a reasonable accommodation of working from home.

146.    On March 20, 2020, Ms. Julia sent an email to Mr. Cohen and Mr. Cherniak letting them know that she would staying home taking vacation time to quarantine because her roommate who worked with COVID-19 patients at Mount Sinai Hospital was sent home from work with a cough and told to quarantine, and Ms. Julia had a raspy throat and was going to contact her doctor. Ms. Julia asked that if any work from home was allowed to let her know because she would gladly do so.  She received no response.

147.    On March 20, 2020, New York State Governor Andrew Cuomo signed the "New York State On Pause" Executive Order directing that all non-essential businesses statewide close

in-office personnel functions effective 8 p.m. on Sunday, March 22, 2020, in an effort to further mitigate the spread of COVID-19.

148.    After Ms. Olmo of Cohen Brothers Human Resources emailed employees stating that the company was reviewing Governor Cuomo's mandate, Ms. Hylemon emailed her, "Veronica, how is this even a question.   Essential is food, pharmaceutical and mass transit. We are non essential."  Ms. Olmo did not respond.  Mr. Cohen, however, told the receptionist that the office remained open.

149.    On March 22, 2020 at 7:14 p.m., Cohen Brothers Human Resources emailed all employees claiming that the "NY State mandate to reduce the in-person workforce by 100% is somewhat ambiguous," and so "we intend to keep our buildings open and operational. Please make your own decision whether or not to come to work being guided by the time off policies previously advised."

150.    Cohen Brothers' policy, however, was illegal and violated the "New York State On Pause" Executive Order, as the employees, and certainly Ms. Arazi, Ms. Hylemon, and Ms. Julia, were not "essential" as defined in that order.

151.    On March 22, 2020, Mr. Fogel became ill with the coronavirus.  No one from Cohen Brothers bothered to inform Ms. Arazi, Ms. Hylemon, or Ms. Julia even though they had worked in close physical proximity to Mr. Fogel through their last day in the office.  Ms. Arazi only found out through a text from Mr. Fogel himself on April 7.

152.    On March 23, 2020, Mr. Cherniak created a letter for employees to show the police or any government authority claiming that they were "essential," even though they were not.

153.    Ms. Arazi, Ms. Hylemon, and Ms. Julia did not receive that letter.

154.   On March 23, 2020, Ms. Arazi emailed Mr. Cohen, Mr. Cherniak, and Human Resources, with the subject line "NY State Mandate," requesting one week of vacation both to care for her ill partner and "to follow the Governor's mandate" to stay home as a non-essential worker.

155.   On March 23, 2020, Ms. Hylemon sent an email to Mr. Cherniak and Human Resources informing them that she would not be in the office until it was safe from the pandemic since she was at high risk due to her Multiple Sclerosis.  She received no response.

156.   On March 25, 2020, Ms. Julia emailed Mr. Fredericks, Mr. Cherniak, and Mr. Cohen asked again to be allowed to work from home.  She received no response.

157.   Ms. Julia communicated to Ms. Olmo and Luz Munoz from Human Resources that Governor Cuomo's mandate did not list Leasing Administrator, her job, as essential, and therefore per the mandate she was going to stay home.

158.   On March 26, 2020, Mr. Cohen, his wife, and their two children flew back to their home in Greenwich, Connecticut.  Despite the company's March 22 email flouting Governor Cuomo's Executive Order and requiring other employees to come to the office or use whatever paid time off they had left and then go unpaid, Mr. Cohen continued to work remotely other than for a few days.

159.   Ms. Cohen's wife showed a total lack of respect for the company's employees, who were being told they could not work from home, by posting on Instagram videos of herself drinking while in quarantine at their home in Greenwich, Connecticut.

160.   On March 29, 2020, Ms. Arazi sent an email to Mr. Cohen, Mr. Cherniak, and Human Resources requesting my second week vacation to abide by the "Governor's mandate,"

and to remain at home to care for Mr. Nadler since his medical condition required her full attention with his breathing difficulties and an oxygen machine.

161.    On March 29, 2020, Ms. Julia emailed Mr. Cherniak, Mr. Fredericks, and Ms. Olmo and informed them that COVID-19 was real, and that her brother-in-law had just died of it, and that she continue to self-quarantine to ensure the safety of herself and her co-workers.

162.    On April 1 and 2, 2020, Ms. Julia again emailed Mr. Fredericks, Mr. Cherniak, Mr. Cohen and Human Resources asking to be "included in any type of work from home situation." She received no response.

163.    On April 2, 2020, Ms. Julia was informed by Human Resources that she had exhausted her paid time off on March 31, 2020.

164.    On April 2, 2020, an employee of the parking lot company at the Cohen Brothers office building died of coronavirus.  Two other employees of the same parking lot company were in quarantine with high fevers.  Yet Cohen Brothers made no statement to employees about their potential exposure, and continued not to flout Governor Cuomo's Executive Order by requiring non-essential workers to come to the office rather than work from home.

165.    On April 4 and 5, 2020, Ms. Arazi emailed Mr. Cohen, and Mr. Cherniak and Human Resources, that she would use her last two personal days on April 6 and 7 of the upcoming week, after which per the company's announced policy she would receive no pay because she did not play to come to the office.

166.    On April 5, 2020, Ms. Hylemon sent an email to Mr. Cherniak and Human Resources notifying them that she would use her final week of vacation, and that her doctor's advice was still not to commute.  She received no response.

167.    On April 9, 2020, Ms. Hylemon emailed Human Resources that per company policy, effective April 14, 2020 she would be staying home without pay until it was safe to return.

168.    On April 21, 2020, a handyman/elevator man named Arturo, who brought mail to the Cohen Brothers office every day, died of coronavirus.  He had worked for the company for 18 years.  Cohen Brothers again made no statement to its employees.

169.    Instead, Mr. Cohen "joked" at the weekly Monday weekly management meeting, "Well, I guess he won't be coming back," as reported to Ms. Julia.

170.    On April 28, 2020, Ms. Arazi emailed Cohen Brothers Human Resources that "I intend to continue following the NY Governor's mandate" by staying home.

171.    On April 30, 2020, Ms. Julia emailed Mr. Fredericks and Human Resources that she would be following New York State's stay-at-home mandate until May 15, 2020, and that she would be self-quarantining since her roommate was ill.

172.    Shortly thereafter, on Thursday, April 30, 2020, Mr. Cherniak emailed Ms. Julia placing her on furlough effective Monday May 4, 2020, with no pay.  Mr. Cherniak sent the same email to Ms. Arazi and Ms. Hylemon on May 1, 2020 placing them on furlough with no pay.

173.    Ms. Arazi, Ms. Hylemon, and Ms. Julia received health benefits (supplemental for Ms. Hylemon) through May 31, 2020, and since then they have had to pay for health benefits.

174.    Ms. Arazi, Ms. Hylemon, and Ms. Julia were the only Cohen Brothers employees placed on furlough on May 1, 2020.

175.    Cohen Brothers' decision to furlough Ms. Arazi, Ms. Hylemon, and Ms. Julia was motivated at least in part by their refusal to participate in, and objection to, the violation of Governor Cuomo's Executive Order.

176.    Cohen Brothers' decision to furlough Ms. Arazi was also motivated by her association with Mr. Nadler, who Cohen Brothers knew had been sick and required her to care for him and that he had or perceived him to have a disability.

177.    Cohen Brothers' decision to furlough Ms. Hylemon was also motivated by her disability (MS) and/or perceived disability, and her request for a reasonable accommodation of working from home.

178.    Cohen has been sued for disability discrimination multiple times, including in *Bernstein v. Charles S. Cohen and Cohen Brothers Realty Corp.*, U.S.D.C./S.D.N.Y. Case No. 14-cv-1515, *Harwood v. Cohen Brothers Realty Corp., Charles Cohen, and Steven Cherniak*, Sup. Ct. N.Y., N.Y County, Index No. 154350/2013, and *Giglio v. Cohen Brothers Realty Corp., Charles DePasquale, and Steven Cherniak*, U.S.D.C./S.D.N.Y. Case No. 10-cv-07818 (disability discrimination concerning MS).

179.    Since May 4, 2020, Ms. Arazi, Ms. Hylemon, and Ms. Julia  have been on furlough.

180.    Cohen Brothers' failure to even try to protect its employees during the pandemic, harassment of plaintiffs for taking the pandemic seriously, and furloughing them in retaliation for refusing to violate Governor Cuomo's Executive Order have caused plaintiffs significant emotional distress.

## RETALIATORY TERMINATION OF EMPLOYMENT

181.    On October 22, 2020, Ms. Arazi, Ms. Hylemon, and Ms. Julia filed this lawsuit against Cohen Brothers.

182.    On February 22, 2021, Ms. Arazi, Ms. Hylemon, and Ms. Julia participated in a mediation with Cohen Brothers in an attempt to settle this lawsuit.  The mediation did not result in a settlement of this lawsuit.

183.     The very next day, February 23, 2021, Cohen Brothers offered to Ms. Arazi, Ms. Hylemon, and Ms. Julia that they return to work at Cohen Brothers in person at its offices in New York City.

184.     On information and belief, Cohen Brothers did not actually want or expect Ms. Arazi, Ms. Hylemon, and Ms. Julia to return to work.  Rather, Cohen Brothers hoped that they would not return to work, and that Cohen Brothers could then try to use that as an excuse to terminate their employment.

185.     No one from Cohen Brothers had contacted Ms. Arazi, Ms. Hylemon, or Ms. Julia to ask them to return to work for almost 10 months from when they were furloughed on May 4, 2020 through February 23, 2022.

186.     Cohen Brothers only made the offers to Ms. Arazi, Ms. Hylemon, and Ms. Julia the day after the mediation failed to result in a settlement of the lawsuit.

187.     Cohen Brothers had hired a replacement for Ms. Arazi as Mr. Cohen's Executive Assistant, Sophie Pierson.  Ms. Pierson performed Ms. Arazi's role from October 2020 to January 2021.  Cohen Brothers hired Ms. Pierson in October 2020 rather than ask Ms. Arazi to return to work.

188.     Cohen Brothers posted Ms. Arazi's position on LinkedIn on February 25, 2021 while it was waiting for her response to its offer to return to work, indicating that Cohen Brothers did not actually want or expect Ms. Arazi to return to work.

189.     Cohen Brothers had hired a replacement for Ms. Hylemon as Mr. Cherniak's Executive Assistant, Aneta Ursu.  Ms. Ursu has been performing Ms. Hylemon's role since about December 2020.  Cohen Brothers hired Ms. Ursu in about December 2020 rather than ask Ms. Hylemon to return to work.

190.    Cohen Brothers also indicated that it would not treat Ms. Arazi, Ms. Hylemon, and Ms. Julia as overtime-eligible if they returned to work.  This would have violated the FLSA and the New York Labor Law.  Ms. Arazi, Ms. Hylemon, and Ms. Julia informed Cohen Brothers that they believed it would be illegal for Cohen Brothers to treat them as exempt from overtime.

191.    Ms. Arazi, Ms. Hylemon, and Ms. Julia informed Cohen Brothers that they believed it would be illegal for them to work in person in New York.  Under New York State's reopening laws announced on April 26, 2020 concerning reopening after the COVID-19-related shut-down Executive Orders from Governor Cuomo, Cohen Brothers as a Commercial Building Management company was allowed to have only "necessary" employees work in person since New York City entered Phase II of the reopening on June 22, 2020 ("limit[] in-person presence to only those staff who               are               necessary               to               be on site," https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/commercial-building-management-master-guidance.pdf) https://gothamist.com/news/everything-you-need-know-about-phase-2-reopening-nyc.

192.    While Cohen Brothers indicated to Ms. Arazi, Ms. Hylemon, and Ms. Julia that it follows "local health guidelines," it failed to explain how their returning to work in person was legal in light of these laws governing the reopening.  Cohen Brothers also refused to provide Ms. Arazi, Ms. Hylemon, and Ms. Julia with a copy of its COVID-related policies.

193.    Cohen Brothers also refused to grant Ms. Hylemon's request for a reasonable accommodation of being allowed to work from home due to her disability of multiple sclerosis. Ms. Hylemon informed Cohen Brothers that she was about to start taking a medication for MS called Ocrevus, which would further compromise her immune system and increase her risk for

viruses and infections and create a higher risk of a severe case of COVID-19.  She provided a doctor's note requesting the work-from-home accommodation.

194.    Cohen Brothers also refused to grant Ms. Arazi's request for a reasonable accommodation of being allowed to work from home due to her disability of a low white blood cell count that creates a higher risk of severe COVID-19.

195.    Cohen Brothers justified its refusal of Ms. Hylemon's and Ms. Arazi's requests to work from home on the grounds that it did not have a work-from-home policy.  However, Cohen Brothers had allowed some other employees to work from home who did not even have disabilities.

196.    Cohen Brothers also failed to engage with Ms. Arazi in an interactive process concerning her request for a reasonable accommodation.

197.    Cohen Brothers also failed to engage with Ms. Hylemon in an interactive process concerning her request for a reasonable accommodation.

198.    Under Cohen Brothers' offer, Mr. Fredericks was going to be Ms. Julia's boss's boss despite having sexually harassed her repeatedly.

199.    Under Cohen Brothers' offer, Mr. Cohen was going to continue to be Ms. Arazi's supervisor despite having created a gender-based hostile work environment.

200.    Under Cohen Brothers' offer, Ms. Hylemon was going to continue to perform work for Mr. Cohen and Mr. Cherniak despite their having created a gender-based hostile work environment.

201.    Cohen Brothers refused to answer, or answer adequately, a number of the questions Ms. Arazi, Ms. Hylemon, and Ms. Julia asked Cohen Brothers about returning to work.

202.    On March 8, 2021, Cohen Brothers terminated the employment of Ms. Arazi, Ms. Hylemon, and Ms. Julia, supposedly for not showing up in person for work that day, even though

they all indicated they were not refusing the offers and were still trying to get answers to their questions.

203.    This was a pretextual reason, as Cohen Brothers' termination of the employment of Ms. Arazi, Ms. Hylemon, and Ms. Julia was in retaliation for their filing the claims in this lawsuit, not settling the lawsuit at the mediation, protesting that returning to work in person would violate New York law, asserting their legal rights to be paid overtime if they returned, and in the case of Ms. Hylemon and Ms. Arazi their disabilities and/or perceived disabilities and requests for reasonable accommodations.

**FIRST CLAIM**
**(Failure To Pay Overtime Under The Fair Labor Standards Act)**

204.    Plaintiffs repeat and reallege all of the allegations contained in this Complaint, as if separately alleged.

205.    Plaintiffs were and are employees under the FLSA.

206.    Cohen Brothers was and is an employer under the FLSA.

207.    Cohen Brothers willfully violated Plaintiffs' rights by failing to pay them overtime compensation.

208.    As a result, Plaintiffs are entitled to their unpaid overtime pay, liquidated damages of an additional 100% of the unpaid overtime pay, attorneys' fees and costs, and prejudgment interest, in amounts to be determined at trial.

**SECOND CLAIM**
**(Unpaid Overtime Under The New York Labor Law**
**§§ 663(1) and 198 and 12 NYCRR § 142)**

209.    Plaintiffs repeat and reallege all of the allegations contained in this Complaint, as if separately alleged.

210.    Plaintiffs were and are employees under the New York Labor Law §§ 2 and 651.

211.    Cohen Brothers was and is an employer under the New York Labor Law §§ 2 and 651.

212.    Cohen Brothers willfully violated Plaintiffs' rights by failing to pay them overtime compensation.

213.    As a result, Plaintiffs are entitled to their unpaid overtime pay, liquidated damages of an additional 100% of the unpaid overtime pay, attorneys' fees and costs, and prejudgment interest, in amounts to be determined at trial.

### THIRD CLAIM
### (Failure To Pay Spread Of Hours Pay Under
### 12 NYCRR § 142 and New York Labor Law § 198)

214.   Plaintiffs repeat and reallege all of the allegations contained herein, as if separately alleged.

215.   Cohen Brothers failed to pay Plaintiffs spread of hours pay for days on which their start time and end time were more than 10 hours apart.

216.   Cohen Brothers willfully violated Plaintiffs' rights under 12 NYCRR § 142 by failing to pay them spread of hours pay.

217.   As a result, Plaintiffs are entitled to their unpaid spread of hours pay, liquidated damages of an additional 100% of the unpaid spread of hours pay, attorneys' fees and costs, and prejudgment interest, in amounts to be determined at trial, under New York Labor Law § 198.

### FOURTH CLAIM
### (Failure To Pay Wages In Violation of New York Labor Law §§ 191, 193, and 198)

218.   Plaintiffs repeat and reallege all of the allegations contained in this Complaint, as if separately alleged.

219.   At all relevant times, Plaintiffs were "employee[s]" for purposes of § 190 of the New York Labor Law.

220.   Cohen Brothers is an "employer" for purposes of § 190 of the New York Labor Law.

221.   By its actions detailed above, Cohen Brothers failed to pay Ms. Arazi and Ms. Julia wages earned, in the form of their salaries, during April 2020, in violation of New York Labor Law §§ 191 and 193.

222.   Plaintiffs are therefore entitled to their unpaid salary, 100% liquidated damages, 9% per year interest, attorneys' fees, and costs.

**FIFTH CLAIM**
**(Failure To Provide Notice Of Pay Rate**
**Under New York Labor Law §§ 195(1) and 198)**

223.    Plaintiffs repeat and reallege all of the allegations contained herein, as if separately alleged.

224.    Cohen Brothers never provided Plaintiffs with proper notices of their rate of pay that met the requirements of New York Labor Law § 195(1).

225.    Plaintiffs are therefore each entitled to $50 for each work day that this violation occurred or continues to occur, not to exceed a total of $5,000, in addition to costs and reasonable attorney's fees, under New York Labor Law § 198(1-b).

**SIXTH CLAIM**
**(Failure To Provide Notice Of Pay Rate**
**Under New York Labor Law §§ 195(3) and 198)**

226.    Plaintiffs repeat and reallege all of the allegations contained herein, as if separately alleged.

227.    Cohen Brothers never provided Plaintiffs with proper wage statements that met the requirements of New York Labor Law § 195(3).

228.    Plaintiffs are therefore each entitled to $250 for each work day that this violation occurred or continues to occur, not to exceed a total of $5,000, in addition to costs and reasonable attorney's fees, under New York Labor Law § 198(1-b).

**SEVENTH CLAIM**
**(Gender-Based Hostile Work Environment/Sexual Harassment**
**Under The New York City Human Rights Law)**

229.    Plaintiffs repeat and reallege all of the allegations contained in this Complaint, as if separately alleged.

230.    Plaintiffs are "person[s]" under § 8-102(1) of the New York City Human Rights Law.

231.    Cohen Brothers is an "employer" for purposes of the New York City Human Rights Law under New York City Administrative Code § 8-102(5).

232.    By its actions detailed above, Defendant unlawfully created a gender-based hostile work environment/sexually harassed Plaintiffs in violation of the New York City Human Rights Law.

233.    Plaintiffs are entitled to remedies including but not limited to damages for emotional distress, attorney's fees and costs, and prejudgment interest, in amounts to be determined at trial.

234.    In addition, because Cohen Brothers created a gender-based hostile work environment/sexually harassed Plaintiffs with willful or wanton negligence, or recklessness, a conscious disregard of the rights of others, or conduct so reckless as to amount to such disregard, Plaintiffs are entitled to punitive damages.

**EIGHTH CLAIM**
**(Gender-Based Hostile Work Environment/Sexual Harassment**
**Under The New York State Human Rights Law)**

235.    Plaintiffs repeat and reallege all of the allegations contained in this Complaint, as if separately alleged.

236.    At all relevant times, Plaintiffs were "employee[s]" for purposes of § 292 of the New York State Human Rights Law.

237.    Cohen Brothers is an "employer" for purposes of § 292 of the New York State Human Rights Law.

238.    By its actions detailed above, Cohen Brothers unlawfully created a gender-based hostile work environment/sexually harassed Plaintiffs in violation of the New York State Human Rights Law.

239.     Plaintiffs are entitled to remedies including but not limited to damages for emotional distress, attorney's fees and costs, prejudgment interest, and punitive damages, in amounts to be determined at trial.

**NINTH CLAIM**
**(Retaliation In Violation of New York Labor Law § 740)**

240.     Plaintiffs repeat and reallege all of the allegations contained in this Complaint, as if separately alleged.

241.     At all relevant times, Plaintiffs were "employee[s]" for purposes of § 740 of the New York Labor Law.

242.     Cohen Brothers is an "employer" for purposes of § 740 of the New York Labor Law.

243.     By its actions detailed above, including but not limited to placing plaintiffs on furlough and terminating their employment and thereby depriving them of compensation, Cohen Brothers unlawfully retaliated against plaintiffs for their refusal to participate in, and objection to, the violation of Governor Cuomo's Executive Orders.

244.     The violation of Governor Cuomo's Executive Orders, which were issued to mitigate the spread of the coronavirus, created and presented a substantial and specific danger to the public health or safety.

245.     Plaintiffs are entitled to remedies including but not limited to an injunction to restrain continued violation of New York Labor Law § 740; the reinstatement of the plaintiffs to the same positions held before the retaliatory personnel action, or to equivalent positions; the reinstatement of full fringe benefits and seniority rights; the compensation for lost wages, benefits and other remuneration;  and the payment by Cohen Brothers of plaintiffs' reasonable costs, disbursements, and attorney's fees.

## TENTH CLAIM
### (Disability/Perceived Disability/Associational Disability Discrimination And Failure To Engage In An Interactive Process And Give Reasonable Accommodations Under The New York City Human Rights Law)

246.     Plaintiffs repeat and reallege all of the allegations contained in this Complaint, as if separately alleged.

247.     Plaintiffs are "person[s]" under § 8-102(1) of the New York City Human Rights Law.

248.     Cohen Brothers is an "employer" for purposes of the New York City Human Rights Law under New York City Administrative Code § 8-102(5).

249.     Ms. Hylemon had a disability and/or perceived disability due to her multiple sclerosis.

250.     Ms. Arazi was associated with someone with a disability, her partner with whom she lived.

251.     Ms. Arazi also had her own disability and/or perceived disability due to her low white blood cell count.

252.     By its actions detailed above, Defendant unlawfully failed to engage Ms. Hylemon in an interactive process regarding reasonable accommodations for her multiple sclerosis, in violation of the New York City Human Rights Law.

253.     By its actions detailed above, Defendant unlawfully failed to give reasonable accommodations, such as working from home, to Ms. Hylemon in an interactive process regarding reasonable accommodations for her multiple sclerosis, in violation of the New York City Human Rights Law.

254.     By its actions detailed above, Defendant discriminated against Ms. Hylemon due to her disability and/or perceived disability, and request for reasonable accommodations, in violation of the New York City Human Rights Law.

255.    By its actions detailed above, Defendant unlawfully failed to engage Ms. Arazi in an interactive process regarding reasonable accommodations for her low white blood cell count, in violation of the New York City Human Rights Law.

256.    By its actions detailed above, Defendant unlawfully failed to give reasonable accommodations, such as working from home, to Ms. Arazi in an interactive process regarding reasonable accommodations for her low white blood cell count, in violation of the New York City Human Rights Law.

257.    By its actions detailed above, Defendant discriminated against Ms. Arazi due to her association with her partner, who had a disability and/or perceived disability, in violation of the New York City Human Rights Law.

258.    By its actions detailed above, Defendant discriminated against Ms. Arazi due to her own disability and/or perceived disability, in violation of the New York City Human Rights Law.

259.    Plaintiffs are entitled to remedies including but not limited to damages for emotional distress, attorney's fees and costs, and prejudgment interest, in amounts to be determined at trial.

260.    In addition, because Cohen Brothers acted with willful or wanton negligence, or recklessness, a conscious disregard of the rights of others, or conduct so reckless as to amount to such disregard, Plaintiffs are entitled to punitive damages.

**ELEVENTH CLAIM**
**(Disability/Perceived Disability/Associational Disability Discrimination And Failure To Engage In An Interactive Process And Give Reasonable Accommodations Under The New York State Human Rights Law)**

261.    Plaintiffs repeat and reallege all of the allegations contained in this Complaint, as if separately alleged.

262.    At all relevant times, Plaintiffs were "employee[s]" for purposes of § 292 of the New York State Human Rights Law.

263.   Cohen Brothers is an "employer" for purposes of § 292 of the New York State Human Rights Law.

264.   Ms. Hylemon had a disability and/or perceived disability due to her multiple sclerosis.

265.   Ms. Arazi was associated with someone with a disability, her partner with whom she lived.

266.   Ms. Arazi also had her own disability and/or perceived disability due to her low white blood cell count.

267.   By its actions detailed above, Defendant unlawfully failed to engage Ms. Hylemon in an interactive process regarding reasonable accommodations for her multiple sclerosis, in violation of the New York State Human Rights Law.

268.   By its actions detailed above, Defendant unlawfully failed to give reasonable accommodations, such as working from home, to Ms. Hylemon in an interactive process regarding reasonable accommodations for her multiple sclerosis, in violation of the New York State Human Rights Law.

269.   By its actions detailed above, Defendant discriminated against Ms. Hylemon due to her disability and/or perceived disability, and request for reasonable accommodations, in violation of the New York State Human Rights Law.

270.   By its actions detailed above, Defendant unlawfully failed to engage Ms. Arazi in an interactive process regarding reasonable accommodations for her low white blood cell count, in violation of the New York City Human Rights Law.

271.   By its actions detailed above, Defendant unlawfully failed to give reasonable accommodations, such as working from home, to Ms. Arazi in an interactive process regarding reasonable accommodations for her low white blood cell count, in violation of the New York City Human Rights Law.

272.     By its actions detailed above, Defendant discriminated against Ms. Arazi due to her association with her partner, who had a disability and/or perceived disability, in violation of the New York State Human Rights Law.

273.     By its actions detailed above, Defendant discriminated against Ms. Arazi due to her own disability and/or perceived disability, in violation of the New York City Human Rights Law.

274.     Plaintiffs are entitled to remedies including but not limited to damages for emotional distress, attorney's fees and costs, prejudgment interest, and punitive damages, in amounts to be determined at trial.

## TWELFTH CLAIM
## (Retaliation Under The Fair Labor Standards Act, 29 U.S.C. § 215 (a)(3))

275.     Plaintiffs repeat and reallege all of the allegations contained in this Complaint, as if separately alleged.

276.     Plaintiffs were and are employees under the FLSA.

277.     Cohen Brothers was and is an employer under the FLSA.

278.     Cohen Brothers terminated Plaintiffs' employment in retaliation for their filing the FLSA claims in this lawsuit, not settling the lawsuit at the mediation, and asserting their legal rights to be paid overtime if they returned to work.

279.     As a result, Plaintiffs are entitled to back pay, front pay or reinstatement, liquidated damages of an additional 100% of back pay, emotional distress damages, attorneys' fees and costs, prejudgment interest, and punitive damages, in amounts to be determined at trial, pursuant to 29 U.S.C. § 216.

## THIRTEENTH CLAIM
## (Retaliation Under The New York Labor Law § 215)

280.     Plaintiffs repeat and reallege all of the allegations contained in this Complaint, as if separately alleged.

281.    Plaintiffs were and are employees under the New York Labor Law §§ 2 and 651.

282.    Cohen Brothers was and is an employer under the New York Labor Law §§ 2 and 651.

283.    Cohen Brothers terminated Plaintiffs' employment in retaliation for their filing the New York Labor Law claims in this lawsuit, not settling the lawsuit at the mediation, and asserting their legal rights to be paid overtime if they returned to work.

284.    As a result, Plaintiffs are entitled to back pay, front pay or reinstatement, liquidated damages of an additional 100% of back pay, emotional distress damages, attorneys' fees and costs, and prejudgment interest.

**FOURTEENTH CLAIM**
**(<u>Retaliation Under The New York City Human Rights Law</u>)**

285.    Plaintiffs repeat and reallege all of the allegations contained in this Complaint, as if separately alleged.

286.    Plaintiffs are "person[s]" under § 8-102(1) of the New York City Human Rights Law.

287.    Cohen Brothers is an "employer" for purposes of the New York City Human Rights Law under New York City Administrative Code § 8-102(5).

288.    By its actions detailed above, Defendant retaliated against Plaintiffs, including but not limited to by terminating their employment, in violation of the New York City Human Rights Law.

289.    Plaintiffs are entitled to remedies including but not limited to back pay, front pay or reinstatement, damages for emotional distress, attorney's fees and costs, and prejudgment interest, in amounts to be determined at trial.

290.    In addition, because Cohen Brothers retaliated against Plaintiffs with willful or wanton negligence, or recklessness, a conscious disregard of the rights of others, or conduct so reckless as to amount to such disregard, Plaintiffs are entitled to punitive damages.

**FIFTEENTH CLAIM**
**(Retaliation Under The New York State Human Rights Law)**

291.    Plaintiffs repeat and reallege all of the allegations contained in this Complaint, as if separately alleged.

292.    At all relevant times, Plaintiffs were "employee[s]" for purposes of § 292 of the New York State Human Rights Law.

293.    Cohen Brothers is an "employer" for purposes of § 292 of the New York State Human Rights Law.

294.    By its actions detailed above, Cohen Brothers retaliated against Plaintiffs, including but not limited to by terminating their employment, in violation of the New York State Human Rights Law.

295.    Plaintiffs are entitled to remedies including but not limited to back pay, front pay or reinstatement, damages for emotional distress, attorney's fees and costs, prejudgment interest, and punitive damages, in amounts to be determined at trial.

WHEREFORE, while reserving the right to seek additional damages as available, Plaintiffs demands judgment against Defendant as follows:

A.    An award of unpaid overtime pay, in amounts to be determined at trial;

B.    An award of liquidated damages of an additional 100% of unpaid overtime pay, in amounts to be determined at trial;

C.    An award of unpaid spread of hours pay, in amounts to be determined at trial;

D.    An award of liquidated damages of an additional 100% of unpaid spread of hours pay, in amounts to be determined at trial;

E.    An award of $5,000 each for the violation of New York Labor Law § 195(1);

F.      An award of $5,000 each for the violation of New York Labor Law § 195(3);

G.      An award of back pay;

H.      An award of reinstatement or front pay;

I.      An award of damages to compensate Plaintiffs for their mental anguish, humiliation, embarrassment, and emotional injury, in amounts to be determined at trial;

J.      An award of reasonable attorneys' fees and the costs of this action;

K.      An award of punitive damages, in amounts to be determined at trial;

L.      Pre-judgment interest at the rate of 9% per year;

M.      Post-judgment interest;

N.      An order directing Cohen Brothers to cease and desist from its unlawful practices, and directing any other applicable injunctive relief; and

O.      All such other and further relief as this Court deems just and proper.


Dated: New York, New York
       April 16, 2021

                                        Law Office of Michael Grenert, PLLC


                                        By: _____s/_____
                                            Michael E. Grenert
                                        120 Riverside Blvd. #12T
                                        New York, New York 10069-0524
                                        Telephone Number: (917) 553-2050
                                        Facsimile: (917) 725-8525
                                        Email: mgrenert@grenertlaw.com

                                        Law Office of Andrea Paparella, PLLC
                                        Andrea M. Paparella, Esq.
                                        4 Dunlap St.
                                        Salem, MA 01970
                                        Telephone:  (617) 680-2400
                                        Facsimile:  (914) 462-3287
                                        Email:  amp@andreapaparella.com