UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:  _____
DATE FILED:  3/28/2022
```

------------------------------------------------------------------ X
          :
CORINNE ARAZI, ROSEANN HYLEMON, and  :
EVELYN JULIA,                   :
          :        1:20-cv-8837-GHW
    Plaintiffs,         :
          :
    -against-      :
          :      MEMORANDUM
COHEN BROTHERS REALTY       :      OPINION AND
CORPORATION,            :       ORDER
          :
    Defendant.        :
          :
------------------------------------------------------------------ X

## I. INTRODUCTION

    Plaintiffs Corinne Arazi, Roseann Hylemon, and Evelyn Julia (collectively, "Plaintiffs") were

employed by Defendant Cohen Brothers Realty Corporation ("Defendant" or "Cohen Brothers").

Plaintiffs assert that they were subjected to cruel treatment and unwanted sexual behavior while

working at Cohen Brothers from the beginning of their employment until the COVID-19 pandemic

began.  Plaintiffs further allege that Defendant failed to accommodate Ms. Hylemon's and Ms.

Arazi's disabilities, as well as the disabilities of Ms. Arazi's partner, during the COVID-19 pandemic.

Moreover, Plaintiffs argue that Defendant's response to the COVID-19 pandemic violated various

New York State Executive Orders.

    In this lawsuit, Plaintiffs bring claims under the Fair Labor Standards Act ("FLSA"), 29

U.S.C. §§ 201 *et seq.*, as well as various provisions of the New York Labor Law (the "NYLL"), the

New York State Human Rights Law (the "NYSHRL"), and the New York City Human Rights Law

(the "NYCHRL").  Defendants moved to dismiss Ms. Arazi's and Ms. Hylemon's claims for gender-

based hostile work environment under the NYCHRL and NYSHRL, as well as Plaintiffs' claims for

retaliation in violation of NYLL § 740; disability discrimination under the NYCHRL and NYSHRL;

and retaliation under FLSA § 215(a)(3), NYLL § 215, the NYCHRL, and the NYSHRL.  Because

Plaintiffs plausibly allege that Defendant created a hostile work environment, and because they also sufficiently plead that Defendant denied them reasonable accommodations and violated various New York State Executive Orders related to COVID-19, Defendant's motion is denied.

## II. BACKGROUND AND PROCEDURAL HISTORY

### a. Factual Background[1]

Plaintiffs Arazi, Hylemon, and Julia were employees at Cohen Brothers, a private real estate development and management firm. Ms. Arazi began her employment on December 5, 2016, as an executive assistant to Defendant's President and Chief Executive Officer, Charles S. Cohen. Third Amended Complaint ("TAC"), Dkt. No. 38, ¶ 8. Ms. Hylemon was an Executive Assistant to Mr. Cohen from March 14, 2014, to March 2016, and the Executive Assistant to Defendant's Chief Operating Officer, Steven Cherniak, beginning in March 2016. *Id.* ¶ 29. Ms. Julia begin working as a Senior Showroom Leasing Administrator starting November 5, 2018.[2] *Id.* ¶ 41.

#### 1. Plaintiffs Experience Unwanted Sexual Behavior at Work

According to Plaintiffs, Ms. Arazi, Ms. Hylemon, and Ms. Julia experienced inappropriate sexual behavior at Cohen Brothers. Ms. Julia "continually suffered from various unwelcome instances of sexual harassment by her direct supervisor, Mr. [Stephen] Fredericks." *Id.* ¶ 50. Those instances included unwelcome comments regarding Ms. Julia's appearance (e.g., "oh my god, you are a bombshell" and "you look so hot with that hair today"), *id.* ¶ 51; inappropriate inquiries into Ms. Julia's love life, *id.* ¶¶ 54–57; and unwelcome physical touching, such as uninvited kisses on the cheek and putting his hands on her shoulder, *id.* ¶ 58. Ms. Julia also heard that Mr. Fredericks

---

[1] The following facts are drawn from the third amended complaint, Dkt. No. 38. The Court "accept[s] all facts alleged in the [amended] complaint as true and draw[s] all reasonable inferences in the plaintiff's favor." *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008) (per curiam).

[2] The third amended complaint also contains numerous allegations regarding Plaintiffs' hours and compensation while working for Defendant. *See e.g.*, TAC ¶¶ 8–49. Those facts are plainly relevant to Plaintiff's FLSA and NYLL claims related to overtime and pay for unpaid overtime and failure to pay wages, which Defendant has not moved to dismiss. Accordingly, the Court needs not discuss those allegations here, and will instead limit its description of the facts to allegations relevant to Defendant's motion to dismiss.

looked at her in a "leering, sexual way" when she would walk away from him. *Id.* ¶ 57. Ms. Hylemon witnessed much of the sexual harassment of Ms. Julia, since Ms. Hylemon sat next to Ms. Julia and the office walls and doors were made of see-through glass. *Id.* ¶ 62.

In addition, in 2019, Ms. Arazi heard Mr. Cohen's wife scream "no more blowjobs" after Mr. Cohen lowered her personal allowance. *Id.* ¶ 69. After that incident, Mr. Cherniak came talk to Ms. Arazi about Ms. Cohen's statements, which was "extremely uncomfortable" for Ms. Arazi. *Id.* ¶ 70. Mr. Cherniak asked if she had heard the "'blowjob' discussion," and later said "that he would not have time to deal with 'blowjob talks' in his busy schedule." *Id.*

Further, Mr. Cherniak would often tell Ms. Hylemon and Ms. Julia "dirty jokes" and "jokes with sexual undertones." *Id.* ¶ 94. Some of those jokes involved the word "gumara" which is "Italian-American slang for [a] married man's mistress." *Id.* ¶ 96. Ms. Hylemon and Ms. Julia often discussed how inappropriate the jokes were. *Id.* ¶ 95.

### 2. Plaintiffs Are "Berated" and "Humiliated" by their Supervisors

Plaintiffs also allege that Mr. Cohen had a "longstanding reputation for verbally abusing, screaming at, berating, belittling, and humiliating employees, particularly [] female employees." *Id.* ¶ 72. According to Plaintiffs, "Mr. Cohen treated female employees . . . substantially worse than male employees" in a number of ways. *Id.* ¶ 73. For instance, Mr. Cohen required that Ms. Arazi let him know when she wanted to use the bathroom, and ask for his permission to do so. *Id.* ¶ 78. If Ms. Arazi used the bathroom when Mr. Cohen was unable to grant permission, and he happened to need her while she was away from her desk, he would scream at her, telling her that she was not supposed to leave her desk without his permission. *Id.* ¶ 79.

Mr. Cohen also yelled at Ms. Hylemon. When she walked away from her desk to get water, Mr. Cohen would "scream her name all across the office," yelling things like "Why are you away from your desk?! You aren't supposed to get up!" *Id.* ¶ 81. In addition, on occasions when he

asked for Ms. Hylemon to come to the conference room, Mr. Cohen would bark "Hurry up, you are walking too slow!"  *Id.*  ¶ 82.  He also screamed at her during one of Cohen Brothers' Christmas parties, asking her, "Why did you give the band the f***ing check?!"  *Id.* ¶ 83.  Further, Mr. Cohen insulted Ms. Hylemon to her then-boyfriend at a Christmas party.  *Id.*  "Many times, [he told] Ms. Hylemon 'I'm going to kill you' when she did something that did not please him."  *Id.* ¶ 85.

According to Plaintiffs, Mr. Cherniak also "berated" Ms. Hylemon.  *Id.* ¶ 97.  He did not, however, berate male employees.  *Id.* ¶ 98.

### 3.  Defendant's Interview Tactics

Plaintiffs aver that Mr. Cohen interviewed female job candidates differently than male candidates.  *Id.* ¶ 87.  When he interviewed a woman, Mr. Cohen would ask the woman whether she was married, whether she had children, and who would care for her children if she came to work at Cohen Brothers.  *Id.*  He did not ask the same questions when interviewing male candidates.  *Id.*

### 4.  Defendant's Response to the COVID-19 Pandemic

Plaintiffs sent various communications to their supervisors in early March 2020 warning of the need to take precautions in light of the COVID-19 pandemic.  For instance, upon learning that "someone named Richard Cohen"[3] was returning to the United States from the United Kingdom where COVID-19 cases were on the rise, Ms. Hylemon sent an email to Mr. Cherniak because she "wanted to make sure that Richard Cohen self-quarantine before returning to Cohen Brothers' New York office."  *Id.* ¶ 101.  Mr. Cherniak told her, "I'm on it," but nevertheless permitted Richard Cohen to return to the New York office on March 9, 2020.  *Id.*  Plaintiffs also allege that Cohen Brothers management permitted an employee to enter common areas in the Cohen Brothers office even though that employee lived in a building where a Westchester man had died from COVID, and

---

[3]Plaintiffs do not provide any detail as to the identify of Mr. Richard Cohen.

also allege that Cohen Brothers allowed clients and vendors to visit the Manhattan office during the week. *Id.* ¶¶ 102, 104.

In the shadow of of mounting numbers of COVID-19 cases, Ms. Hylemon and Ms. Julia started taking precautions in the office, including supplying themselves with hand sanitizer and gloves. *Id.* ¶ 106. Cohen Brothers executives, including Mr. Cherniak and Mr. Horowitz, laughed at Ms. Hylemon and told her that she was "taking this way too serious[ly]." *Id.* ¶ 107. Mr. Cherniak also sent Ms. Hylemon video clips of individuals criticizing the media's coronavirus coverage. *Id.* ¶ 108. In addition, Mr. Cherniak and other employees "mocked and made fun" of Ms. Julia and Ms. Hylemon for their reactions, calling the women "overreactors." *Id.* ¶ 110.

On March 12, 2020, New York City Mayor Bill de Blasio declared a state of emergency in New York City. *Id.* ¶ 114. Ms. Julia heard Mr. Cohen "shouting to other Cohen Brothers executives how it was ridiculous how the news was portraying the pandemic and that there is no way it is as bad as the news says it is." *Id.* ¶ 115. Mr. Cohen yelled to Ms. Arazi, "we have to be a soldier and soldier on, right Corinne?" *Id.* Plaintiffs allege that Cohen Brothers continued to "ma[k]e every effort to require" its employees to come into the office. *Id.* ¶ 118.

On March 15, 2020, Ms. Hylemon, who suffers from multiple sclerosis ("MS"), emailed to Mr. Cherniak and Defendant's human resources department ("Human Resources") a doctor's note advising that Ms. Hylemon should not travel into the office [in] Manhattan because her immune system was compromised. *Id.* ¶ 119. Neither Mr. Cherniak nor Human Resources responded to Ms. Hylemon's request. *Id.* ¶ 125. The next day, on March 16, 2020, Ms. Hylemon called Mr. Cherniak and left him a voicemail, but he did not respond. *Id.* ¶ 127. She texted him later in the morning to ask if he had received her email. *Id.* He said, "Yes. In staff meeting." *Id.* She texted back, "You did not answer. I have a doctor's note. My immune system is compromised due to the

MS. If you think I'm not there[] just because. Then you are completely wrong [sic]." *Id.* From that point forward, Mr. Cherniak left Ms. Hylemon off email correspondence. *Id.* ¶ 128.

The same day, March 16, 2020, Ms. Arazi sent an email to Mr. Cohen, Mr. Cherniak, Human Resources, and Cohen Brothers' reception. She "took a sick week" because she was suffering from flu-like symptoms, and had made the choice to self-quarantine. *Id.* ¶ 129. She also mentioned that her partner was feeling sick. *Id.* ¶ 130.

That day, Mr. Cherniak sent an email to all employees offering no-cost parking and carpooling to encourage employees come to work at the office. *Id.* ¶ 132. Ms. Julia also heard Mr. Cohen tell his son—a Cohen Brothers employee who suffered from Lyme Disease—that "there was no work from home policy" after his son informed Mr. Cohen that he would not come to the office. *Id.* ¶ 133. Mr. Cohen told Mr. Cherniak and another employee that his son was a "coward" and that they should shut off his son's phone and get his son's work from his office. *Id.*

The next day, on March 17, 2020, Human Resources sent an email to employees "advising them to maintain a positive attitude and be mindful of their conversations and tone around coworkers." *Id.* ¶ 134. That email also stated that Cohen Brothers had "no work from home policies . . . stay home permitted when using sick, personal or vacation time . . . beyond without pay." *Id.* ¶ 135 (alterations in original).

On March 18, 2020, Mr. Hylemon texted Mr. Cherniak "a screenshot of New York Governor Andrew Cuomo's mandate reducing the non-essential workforce by 50%." *Id.* ¶ 137; *see also* N.Y. Exec. Order No. 202.6 (Mar. 18, 2020). Ms. Julia, who was still working in the office, saw that Mr. Cherniak called in another executive and said, "what, am I supposed to believe a text message?" *Id.* ¶ 137. Mr. Cherniak and the other executive laughed and said it was "fake news." *Id.* Ms. Julia stopped coming to the office after March 18, 2020. *Id.* ¶ 138. According to Plaintiffs, Cohen Brothers never complied with the order to reduce the workforce. *Id.*

The next day, March 19, 2020, Ms. Arazi texted Mr. Cherniak and told him that she was experiencing flu-like symptoms, and also that her partner had been tested for COVID-19 because he had pneumonia and a cough. *Id.* ¶ 139.  The same day, Governor Cuomo issued Executive Order 202.7, which mandated that businesses reduce their non-essential workforce by 75%. *Id.* ¶ 141; *see also* N.Y. Exec. Order No. 202.7 (Mar. 19, 2020).  Plaintiffs allege that Cohen Brothers did not comply with this order, and also allege that, on that date, Cohen Brothers furloughed two employees that had requested permission to work from home. *Id.*  ¶ 142–43.

On March 20, 2020, Governor Cuomo issued Executive Order 202.8, which stated

> [a]ll businesses and not-for-profit entities in the state shall utilize, to the maximum extent possible, any telecommuting or work from home procedures that they can safely utilize.  Each employer shall reduce the in-person workforce at any work locations by 100% no later than March 22 at 8 p.m.  Any essential business or entity providing essential services or functions shall not be subject to the in-person restrictions.

N.Y. Exec. Order 202.8 (Mar. 20, 2020) (together with Executive Orders 202.6 and 202.7, the "Executive Orders").  A Cohen Brother's Human Resources employee sent employees an email stating that the company was reviewing that Executive Order. TAC ¶ 148.  Ms. Hylemon emailed that employee saying "how is this even a question.  Essential is food, pharmaceutical and mass transit.  We are non essential." *Id.*  The employee did not respond. *Id.*  Despite the order, Mr. Cohen "told the receptionist that the office remained open." *Id.*

In addition, on March 20, 2020, Ms. Julia emailed Mr. Cohen and Mr. Cherniak letting them know she would be staying at home and taking vacation time to quarantine because her roommate had been exposed to COVID, and because Ms. Julia had a raspy throat. *Id.* ¶ 146.  She did not receive a response. *Id.*

"On March 23, 2020, Mr. Cherniak created a letter for employees to show the police or any government authority claiming that they were 'essential,' even though they were not." *Id.* ¶ 152.  Plaintiffs did not receive that letter. *Id.* ¶ 153.

Also "[o]n March 23, 2020, Ms. Arazi emailed Mr. Cohen, Mr. Cherniak, and Human Resources, with the subject line 'NY State Mandate,' requesting one week of vacation both to care for her ill partner and 'to follow the Governor's mandate' to stay home as a non-essential worker." *Id.* ¶ 154. Ms. Hylemon also emailed Mr. Cherniak and Human Resources, informing them that she would not be in the office until it was safe, since she was at high risk because of her multiple sclerosis. *Id.* ¶ 155. Two days later. Ms. Julia emailed Mr. Fredericks, Mr. Cherniak, and Mr. Cohen asking to be allowed to work from home. *Id.* ¶ 156. She did not receive a response. *Id.* She also told Human Resources that leasing administrators were not listed as an essential, so she would stay home. *Id.* ¶ 157.

On March 29, 2020, Ms. Arazi requested a "second week of vacation to abide by the 'Governor's mandate'" and so that she could remain home and care for her partner, who was having breathing difficulties and was using an oxygen machine. *Id.* ¶ 160.

Then, on April 1, 2020, Human Resources informed Ms. Julia that she had exhausted her paid time off the previous day. *Id.* ¶ 163. Ms. Arazi emailed Mr. Cohen, Mr. Cherniak. and Human Resources, noting that she would use her last personal days after which she would remain home with no pay. *Id.* ¶ 165. Ms. Hylemon also told Mr. Cherniak and Human Resources that she would use her final week of vacation, but did not receive a response. *Id.* ¶ 166. Ms. Arazi and Ms. Julia later emailed Defendant to reaffirm that they would be staying at home to comply with the Governor's mandate. *Id.* ¶¶ 170, 171.

On April 30, 2020, Ms. Julia was placed on furlough with no pay. *Id.* ¶ 172. Ms. Arazi and Ms. Hylemon were placed on furlough with no pay the next day. *Id.* The three were the only Cohen Brothers employees placed on furlough on April 30 and May 1, 2020. *Id.* ¶ 174.

### 5. Plaintiffs File this Lawsuit and Are Terminated

On October 22, 2020, Plaintiffs filed this lawsuit against Cohen Brothers. *Id.* ¶ 181; *see also* Dkt. No. 1. Four months later, on February 22, 2021, Ms. Arazi, Ms. Hylemon, and Ms. Julia participated in a mediation with Cohen Brothers, but that mediation did not result in a settlement. TAC ¶ 182. The next day, Cohen Brothers offered Plaintiffs the opportunity to return to work at their offices in New York City. *Id.* ¶ 183. Prior to that date, no one had asked any of the women to return to work. *Id.* ¶ 185. In fact, Cohen Brothers had hired a replacement for Ms. Arazi in October 2020. *Id.* ¶ 187. It also hired a replacement for Ms. Hylemon around December 2020. *Id.* ¶ 189. Further, on February 25, 2021, Cohen Brothers posted Ms. Arazi's position on LinkedIn while waiting for her response to Cohen Brothers' offer to return to work. *Id.* ¶ 188.

In response to the offer of employment, Plaintiffs informed Defendant that they "believed it would be illegal for them to work in person in New York," given that, according to Plaintiffs, the reopening laws announced on April 26, 2020, stated that companies like Defendant's were "allowed to have only 'necessary' employees work in person." *Id.* ¶ 191. Defendant told Ms. Hylemon that it would not allow her to work from home despite that fact that she suffered from multiple sclerosis and was about to start taking a drug that would compromise her immune system. *Id.* ¶ 193. "Cohen Brothers also refused to grant Ms. Arazi's request for a reasonable accommodation of being allowed to work from home due to her disability of low white blood cell count." *Id.* ¶ 194. Cohen Brothers "refused to answer, or answer adequately, a number of the questions" that Plaintiffs asked about returning to work. *Id.* ¶ 201.

Then, on March 8, 2021, Cohen Brothers terminated Plaintiffs' employment, "supposedly for not showing up in person for work that day." *Id.* ¶ 202. At that point, all of the women had "indicated that they were not refusing the offers and were still trying to get answers to their questions." *Id.* ¶ 202.

### b. Procedural History

Plaintiffs filed their complaint on October 22, 2020.  Dkt. No. 1.  Plaintiffs amended their complaint on January 1, 2021, Dkt. No. 17, and again on April 16, 2021, Dkt. No. 38.  Defendant moved to dismiss the third amended complaint on May 19, 2021.  Dkt. No. 44 ("Mot.").  Plaintiffs filed an opposition on June 11, 2021.  Dkt. No. 48.  On June 17, 2021, the Court granted leave for the National Employment Lawyers Association/New York ("NELA/NY") to file an amicus curiae brief related to Plaintiffs' claims under New York Labor Law § 750.  Dkt. No. 53.  That brief was filed on June 18, 2021.  Dkt. No. 55.  Defendant replied to Plaintiff's opposition and the NELA/NY's amicus brief on July 2, 2021.  Dkt. No. 56 ("Reply"); Dkt. No. 57.

## III.        LEGAL STANDARD

A complaint need only contain "a short and plain statement . . . showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  A defendant may move to dismiss a claim that does not meet this pleading standard for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  On a motion filed under Rule 12(b)(6), the court accepts as true the facts alleged in the complaint and draws all reasonable inferences in the plaintiff's favor.  *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008) (per curiam).  But "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are inadequate.  *Iqbal*, 556 U.S. at 678 (*citing Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  And "[t]he tenet that a court must accept as true" a complaint's factual allegations does not apply "to legal conclusions."  *Iqbal*, 556 U.S. at 678 (alterations omitted).

To survive dismissal, a complaint must allege sufficient facts to state a plausible claim.  *Twombly*, 550 U.S. at 570.  A claim is plausible when the plaintiff pleads facts to support the reasonable inference that the defendant has acted unlawfully.  *Iqbal*, 556 U.S. at 678 (*citing Twombly*, 550 U.S. at 556).  The plaintiff's claim must be more than merely "speculative."  *Twombly*, 550 U.S. at

545.  And a reviewing court must "draw on its judicial experience and common sense" to determine plausibility.  *Iqbal*, 556 U.S. at 679 (citation omitted).

On a motion to dismiss, a court must generally "limit itself to the facts stated in the complaint."  *Field Day, LLC v. County of Suffolk*, 463 F.3d 167, 192 (2d Cir. 2006) (quoting *Hayden v. County of Nassau*, 180 F.3d 42, 54 (2d Cir.1999)).  But a court may consider "any 'written instrument' . . . attached to [the complaint] as 'an exhibit' or . . . incorporated in it by reference."  *Lynch v. City of New York*, 952 F.3d 67, 79 (2d Cir. 2020) (quoting Fed. R. Civ. P. 10(c) (other citations omitted)).  A court may also consider a document "solely relie[d] on by the plaintiff if it "is integral to the complaint."  *Id.* (quotation and brackets omitted).  A document is "integral to the complaint" if the complaint "relies heavily" on the document's "terms and effect."  *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230 (2d Cir. 2016); *see also Littlejohn v. City of N.Y.*, 795 F.3d 297, 305 n.3 (2d Cir. 2015) (holding that a court may "consider the plaintiff's relevant filings with the EEOC" on a motion to dismiss if the filings "are integral to and solely relied upon by the complaint" (quotation and brackets omitted)).  A plaintiff must "rely on the terms and effect of the document in drafting the complaint; mere notice or possession is not enough."  *Nicosia*, 834 F.3d at 231 (emphasis added) (*quoting Glob. Network Commc'ns, Inc. v. City of N.Y.*, 458 F.3d 150, 156 (2d Cir. 2006).

IV.     **DISCUSSION**

a.  **Disability Discrimination and Failure to Accommodate Under the NYSHRL and NYCHRL**

Plaintiffs plead disability discrimination under a theory of failure to accommodate.  *See* TAC ¶¶ 246–74.  "Courts apply the same standard for failure to accommodate cases under the ADA, Rehabilitation Act, NYSHRL, and NYCHRL."  *Lawtone-Bowles v. City of New York*, No. 17cv8024, 2019 WL 652593, at *6 (S.D.N.Y. Feb. 15, 2019) (citing *Rodriguez v. City of New York*, 197 F.3d 611, 618 (2d Cir. 1999)).  To maintain a claim for failure to accommodate, "an employee must show that: '(1) [he] is a person with a disability under the meaning of the [NYSHRL]; (2) an employer covered

by the statute had notice of his disability; (3) with reasonable accommodation, [the employee] could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations.'" *Noll v. Int'l Bus. Machs. Corp.*, 787 F.3d 89, 94 (2d Cir. 2015) (quoting *McBride v. BIC Consumer Prods. Mfg. Co., Inc.*, 583 F.3d 92, 97 (2d Cir. 2009) (alterations in original)); *see also Vinokur v. Sovereign Bank*, 701 F. Supp. 2d 276, 293 (E.D.N.Y. 2010) (providing the same standard for NYCHRL claims).

"[T]he NYCHRL presumes all accommodations to be reasonable until proven otherwise." *LeBlanc v. United Parcel Serv.*, No. 11-cv-6983, 2014 WL 1407706, at *18 (S.D.N.Y. Apr. 11, 2014); *see also* N.Y.C. Admin. Code § 8-102 ("The [employer] has the burden of proving undue hardship."). Only after the plaintiff has satisfied its "burden[] of production and persuasion as to the existence of an accommodation that is facially reasonable" does the burden "shift[] to the defendant to rebut the reasonableness of the proposed accommodation," which "is in essence equivalent to the burden of showing, as an affirmative defense, that the proposed accommodation would cause the defendant to suffer an undue hardship." *Wright v. N.Y. State Dep't of Corr.*, 831 F.3d 64, 76 (2d Cir. 2016) (internal quotation marks, citations, and alterations omitted).

In addition, the New York legislature amended the NYSHRL on August 19, 2019, to establish that its provisions should be construed liberally even if "federal civil rights laws, including those laws with provisions worded comparably to the provisions of this article," have been construed narrowly. *Deveaux v. Skechers USA, Inc.*, No. 19-cv-9734, 2020 WL 1812741, at *3 n.3 (S.D.N.Y. Apr. 9, 2020) (quoting Act of Aug. 12, 2019, sec. 6, 2019 N.Y. Laws 160 (codified at N.Y. Exec. Law § 300 (2019))).[4] "[T]he effect of [that amendment] is to render the standard for claims

---

[4] Specifically, the statute was amended "to eliminate the requirement that harassing or discriminatory conduct be 'severe or pervasive' for it to be actionable and to adopt instead a more protective standard that prohibits conduct that results in 'inferior terms, conditions or privileges of employment.'" *Maiurano v. Cantor Fitzgerald Sec.*, No. 19 CIV. 10042, 2021 WL 76410, at *3 n.2 (S.D.N.Y. Jan. 8, 2021) (quoting N.Y. Exec. Law § 296(1)(h)).

[under the NYSHRL] closer to the standard under the NYCHRL." *Wellner v. Montefiore Med. Ctr.*, No. 17 CIV. 3479, 2019 WL 4081898, at *5 n.4 (S.D.N.Y. Aug. 29, 2019).  Those amendments "apply to claims that accrue on or after the effective date of October 11, 2019."  *Id.*

### 1.   Ms. Hylemon Adequately Pleads Failure to Accommodate her Disability under the NYCHRL and the NYSHRL

The parties do not dispute that Ms. Hylemon adequately pleads the second, third, and fourth elements of a failure to promote claims; they disagree only on whether Ms. Hylemon has sufficiently alleged that she had a disability under the NYSHRL and NYCHRL.  She has.  "The NYSHRL and NYCHRL 'have a broader definition of "disability" than does the ADA; neither statute requires any showing that the disability substantially limits a major life activity.'  *Thomson v. Odyssey House*, 2015 WL 5561209, at *18 (S.D.N.Y. Sept. 21, 2015) (quoting *Reilly v. Revlon, Inc.*, 620 F. Supp. 2d 524, 541 (S.D.N.Y. 2009)); *see also Giordano v. City of New York*, 274 F.3d 740, 754 (2d Cir. 2001) ("[The] definition of disability under New York law is not coterminous with the ADA definition").

Rather, the NYSHRL defines disability as "(a) a physical, mental or medical impairment resulting from anatomical, physiological, genetic or neurological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques or (b) a record of such an impairment or (c) a condition regarded by others as such an impairment, provided, however, that in all provisions of this article dealing with employment, the term shall be limited to disabilities which, upon the provision of reasonable accommodations, do not prevent the complainant from performing in a reasonable manner the activities involved in the job or occupation sought or held."  N.Y. Exec. Law § 292(21).

The NYCHRL defines disability as "any physical, medical, mental or psychological impairment, or a history or record of such impairment."  N.Y.C. Admin. Code § 8-102(16)(1). Those categories encompass "[a]n impairment of any system of the body; including, but not limited to, the neurological system; the musculoskeletal system; the special sense organs and respiratory

organs, including, but not limited to, speech organs; the cardiovascular system; the reproductive

system; the digestive and genito-urinary systems; the hemic and lymphatic systems; the

immunological systems; the skin; and the endocrine system[] or [a] mental or psychological

impairment." *Id.*

Defendant does not dispute that multiple sclerosis is disability recognized by the NYSHRL

and NYCHRL.  Instead, Defendant argues that Ms. Hylemon did not, in fact, seek an

accommodation for her multiple sclerosis, but instead sought an accommodation for "the fear of

being at risk of developing a severe form of COVID-19."  Mot. at 6.  That argument is nonsensical.

It is simply not the case that Ms. Hylemon requested an accommodation because she "feared"

COVID-19; as alleged, she requested to work from home during the pandemic "since she was at

high risk *due to her Multiple Sclerosis*."  TAC ¶ 155 (emphasis added).  To break it down, Ms.

Hylemon's multiple sclerosis impaired her immune system, such that she was more susceptible to

serious illness should she develop COVID-19.  Thus, because of her multiple sclerosis, working in

an office with numerous other people during the COVID-19 pandemic posed a higher risk to Ms.

Hylemon than it would to most other employees.  As alleged, an accommodation could mitigate that

increased risk—an increased risk which, again, stemmed from her multiple sclerosis.  *See Bar-Tur v.*

*Arience Cap. Mgmt., L.P.,* No. 09 CIV. 2653, 2011 WL 565333, at *10 (S.D.N.Y. Feb. 9, 2011)

(determining that Common Variable Immunodeficiency, a disease that suppressed the plaintiff's

immune system and made her "more likely to become sick than the average person," was a disability

under the NYSHRL and NYCHRL), *aff'd in part, vacated in part, remanded*, 490 F. App'x 392 (2d Cir.

2012).[5]  In other words, it is not the case that Ms. Hylemon requested an accommodation solely

---

[5] Guidance from the Equal Employment Opportunity Commission ("EEOC") and New York City Human Rights
Commission on Human Rights (the "Commission") only bolsters the conclusion that an individual with an underlying
condition that renders them more susceptible to COVID-19—such as multiple sclerosis—has a disability for which they
may seek an accommodation under the NYCHRL and NYSHRL. *Cf. Burke v. Royal Ins. Co.*, 39 F. Supp. 2d 251, 258
(E.D.N.Y. 1999) ("Interpretative guidelines, although not controlling on federal courts, 'constitute a body of experience

because she "feared" COVID-19.  *See* Reply at 9.  Indeed, under Defendant's skewed theory, a

person suffering from diabetes would arguably seek an accommodation—such as periodic breaks to

check their blood sugar—not because they have diabetes, but because they "fear" hypoglycemia.

That is plainly not the case.

At base, Ms. Hylemon requested an accommodation because of her multiple sclerosis, not

because of her "fear."  Thus, because multiple sclerosis is a disability, and the parties do not dispute

that Ms. Hylemon suffered from multiple sclerosis, she sufficiently pleads that she was a person with

a disability under the NYCHRL and NYSHRL.

Defendant's reliance on *Simmons v. Woodycrest Ctr. For Hum. Dev., Inc.* is misplaced.  No. 10

CIV. 5193 JSR, 2011 WL 855942 (S.D.N.Y. Mar. 9, 2011).  In that case, the plaintiff requested an

accommodation because he suffered from high blood pressure.  *Id.* at *4.  The court there

determined that high blood pressure was *not* a disability, even though it was "a risk factor for several

serious ailments."  *Id.*  Thus, in that case, the plaintiff's underlying condition—high blood

pressure—*was not* a disability.  Here, there is no dispute that the plaintiff's underlying condition—

---

and informed judgment to which courts and litigants may properly resort for guidance.'"(quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986) (internal quotations omitted) (citations omitted)).

As Plaintiffs point out, the Commission's May 20, 2020 guidance provided that "[a]n employee is entitled to reasonable accommodations related to a disability, and that remains true when the disability puts them at increased risk of complications from COVID-19."  N.Y.C. Comm. on Hum. Rts., Employment Questions Related to COVID-19 and Remote Work (May 20, 2020), https://www1.nyc.gov/assets/cchr/downloads/pdf/materials/COVID-employment-faq.pdf.  Under that guidance, Ms. Hylemon would be entitled to a reasonable accommodation on the basis of her multiple sclerosis.

Defendant points out that more recent guidance from the New York City Health Department does not include individuals with multiple sclerosis as having an increased risk for severe illness developing as a result of COVID-19.  *See* Centers for Disease Control and Prevention, COVID-19: People with Certain Medical Conditions, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last accessed Mar. 10, 2022); Dkt. No. 45 Ex. 1, at 4 (providing same list of conditions from December 22, 2020).  Assuming without deciding that the Court can take judicial notice of that guidance, Ms. Hylemon requested accommodations in March and April 2020, during the early stages of the pandemic when little was known about the disease, and after receiving advice that she was at a higher risk from her doctor. TAC ¶¶ 155, 166, 172.  Drawing all inferences in Plaintiffs' favor, they have sufficiently pleaded that during the operative periods in this case, COVID-19 was reasonably believed to pose a significant risk to individuals with multiple sclerosis.

multiple sclerosis—*is* a disability.  Accordingly, Ms. Hylemon has sufficiently pleaded disability discrimination under the NYSHRL and the NYCHRL.

### 2.  Ms. Arazi Adequately Pleads Failure to Accommodate under the NYCHRL and the NYSHRL

For similar reasons, Ms. Arazi adequately pleads failure to accommodate under the NYSHRL and NYCHRL.  Defendant does not dispute that low white blood cell count constitutes a disability,[6] nor do they dispute that Plaintiffs sufficiently allege that they had notice of Ms. Arazi's disability, that Ms. Arazi could perform her job with a reasonable accommodation, and that they denied that accommodation.  Instead, they argue only that Ms. Arazi sought an accommodation because she "feared" catching COVID, not on account of her having low white blood cell count.  Mot. at 8.  But as explained above, that argument constitutes a poor attempt to obfuscate, and arguably make light of, Ms. Arazi's actual disability—low white blood cell count.  Accordingly, Ms. Arazi has stated a claim for disability discrimination under the NYSHRL and NYCHRL.

### 3.  Ms. Arazi Adequately Pleads Failure to Accommodate Based on Associational Disability under the NYCHRL, But Not the NYSHRL

As an initial matter, Ms. Arazi does not plead a claim for failure to accommodate based on associational disability under the NYSHRL, because the NYSHRL "does not provide for a claim of disability association discrimination."[7]  *Abdel-Khalek v. Ernst & Young, L.L.P.*, No. 97 CIV. 4514,

---

[6] As noted, NYSHRL and NYCHRL broadly define "disability" to include "impairments," and low white blood cell count is alleged to impair the immune system.

[7] The NYSHRL makes it unlawful for "an employer or licensing agency, because of *an individual's* age, race, creed, color, national origin, sexual orientation, gender identity or expression, military status, sex, disability, predisposing genetic characteristics, familial status, marital status, or status as a victim of domestic violence, to refuse to hire or employ or to bar or to discharge from employment *such individual* or to discriminate against *such individual* in compensation or in terms, conditions or privileges of employment."  N.Y. Exec. Law § 296 (emphasis added).  As shown by the italicized language in this quotation, the statutory text makes the discriminatory conduct illegal if it is based on the relevant individual's disability.  The Court recognizes that other courts have found that associational disability claims are cognizable under the NYSHRL.  But the Court is not persuaded by the analysis in those cases because they are based on decisions that analyze associational discrimination in the context of protected characteristics other than disability.  The federal cases that have considered this issue rely heavily on the Second Department's decision in *Chiara v. Town of New Castle*, 2 N.Y.S. 3d 132 (App. Div. 2d Dep't 2015).  *See, e.g. Canales v. ACP Facility Servs., Inc.*, 2017CV6937, 2019 WL 1171479, at *4

(E.D.N.Y. Mar. 13, 2019) (relying on *Chiara* to conclude that a plaintiff "may assert an associational discrimination claim under the NYSHRL" in the context of a disability claim).

But the court in *Chiara* did not address associational discrimination claims as a result of a disability. *Chiara* involved discrimination on the basis of a non-Jewish spouse's association with his Jewish spouse. Borrowing from Title VII jurisprudence concerning interracial couples, the Appellate Division noted that "where an employee is subjected to adverse action because an employer disapproves of interracial association, the employee suffers discrimination because of the employee's *own* race." *Chiara*, 2 N.Y.S. 3d at 121 (quoting *Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008). The Court agrees fully with *Chiara*'s conclusion in the context of the kind of associational discrimination claim that the court analyzed there. As *Chiara* concluded, this well-founded concept from Title VII law translates well to the text of the NYSHRL. *See* N.Y. Exec. Law § 296 (it is unlawful for an employer "because of an individual's . . . race . . . to discriminate against such individual . . . ."). When an employer discriminates against an individual based on her association with a person of another race, it is effectively discriminating against the individual because of her race.

But the logic does not work well in the context of a disability claim because the text refers to the "disability" of the relevant individual. *See* N.Y. Exec. Law § 296 (it is unlawful for an employer "because of an individual's . . . disability . . . to discriminate against such individual . . . ."). Under the statute, to be unlawful the discrimination must be based on the individual's disability. The reasoning that underlies *Chiara* falters here, because if an plaintiff who does not have a disability is discriminated against because of her association with someone who has a disability, it would not be logical to say that the plaintiff was discriminated against because of her disability.

It should also be noted that Title VII does not apply to disability discrimination, so the caselaw upon which *Chiara* relied to reach its conclusion simply does not provide support for its conclusion in the context of disability discrimination. The Americans with Disabilities Act (the "ADA") expressly provides for a claim of associational disability discrimination. *See* 42 U.S.C.A. § 12112(b)(4) (prohibiting "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association."). But the right is expressly provided for by the statutory text. The NYSHRL, by contrast, contains no express authorization for associational disability claims.

In short, because the NYSHRL makes illegal discriminatory conduct based on the "disability" of the plaintiff, and association with a person with a disability does not render a non-disabled plaintiff "disabled," the NYSHRL does not give rise to a claim for associational discrimination on the basis of disability. While *Chiara* rightly concluded that associational claims for discrimination are available under the NYSHRL for other protected classifications, the Title VII caselaw underlying *Chiara* does not provide a basis to read out of its text the statute's requirement that the plaintiff be disabled. Federal courts are "bound to apply the law as interpreted by a state's intermediate appellate courts unless there is persuasive evidence that the state's high court would reach a different conclusion." *United States v. Muhammad*, 595 F.3d 426, 432 (2d Cir. 2010). Here, there is persuasive evidence that the New York Court of Appeals would reach a different conclusion than *Chiara*—principally the text of the statute, as reviewed carefully in *Abdel-Khalek*, together with a recognition of the limitations of the Title VII analogy in the context of a disability claims, given the text of the statute. To create such a right, text akin to that included in the ADA would be required. Accordingly, the Court adopts the conclusion that claims for associational disability are not cognizable under the NYSHRL.

In addition, the Court briefly notes that the 2019 amendments to the NYSHRL did not alter the text pertaining to whether the statute can support a claim for associational disability. Thus, while standards used to analyze the NYSHRL are now more aligned with those used to analyze the NYCHRL, the Court is still bound by the text of the statute, which does not contemplate claims for discrimination by an able-bodied person on the basis of her association with someone with a disability.

1999 WL 190790, at *9 (S.D.N.Y. Apr. 7, 1999). "[T]he plain language of the New York State

Human Rights Law clearly indicates that it only prohibits discrimination against individuals who are

themselves disabled." *Id.* (citing N.Y. Exec. Law § 296(1)(a). Specifically, the NYSHRL prohibits

"an employer or licensing agency, because of an individual's . . . disability . . . to refuse to hire or

employ or to bar or to discharge from employment *such individual* or to discriminate against *such*

*individual* in compensation or in terms, conditions or privileges of employment." N.Y. Exec. Law §

296(1)(a). Thus, Ms. Arazi's claim failure to accommodate based on her husband's disability

necessarily fails.

By contrast, "there is a textual basis under the [NYCHRL] for a claim of disability

association discrimination." *Abdel-Khalek*, 1999 WL 190790, at *9. The NYCHRL provides that its

provisions should be "construed to prohibit such discrimination against a person because of the

actual or perceived race, creed, color, national origin, disability, age, sexual orientation, uniformed

service or immigration or citizenship status of *a person with whom such person has a known relationship or*

*association*." N.Y.C. Admin. Code § 8–107(20) (emphasis added). "The NYCHRL thus provides a

cause of action for disability association discrimination." *Ladepo v. United Cerebral Palsy of N.Y.C.,*

*Inc.,* No. 15-CV-7026, 2018 WL 4356726, at *11 (S.D.N.Y. Sept. 12, 2018) (citing *Abdel-Khalek*, 1999

WL 190790, at *9); *Bartman v. Shenker*, 786 N.Y.S.2d 696, 700 (N.Y. Sup. Ct. 2004) ("[The

NYCHRL] explicitly grants standing to sue to those who have been discriminated against by virtue

of their association with a disabled individual . . . ."). Thus, Ms. Arazi may bring a claim for failure

to accommodate based on her partner's alleged disability.

Ms. Arazi sufficiently pleads associational discrimination under the NYCHRL. To allege

associational disability, Plaintiffs must sufficiently plead elements that are virtually identical to those

above: they must allege (1) that Ms. Arazi's partner suffered from a disability; (2) that Defendant

knew of her partner's disability; (3) with reasonable accommodation, Ms. Arazi could perform the

essential functions of the job at issue; and (4) the employer has refused to make such accommodations. *See Pinckney v. Carroll,* No. 18-CV-12198 (VEC), 2019 WL 6619484, at *6 (S.D.N.Y. Dec. 4, 2019) (listing those elements in a claim of failure to accommodate based on associational disability); *Cohen v. Integrated Project Delivery Partners Inc.*, No. 18CIV2581, 2020 WL 419600, at *4 (S.D.N.Y. Jan. 27, 2020) (same).

Here, the parties dispute only whether COVID-19 is a disability,[8] such that Ms. Arazi may properly state claim for failure to accommodate based on her partner's illness. Ms. Arazi sufficiently pleads that COVID-19 is a disability under the NYSHRL and NYCHRL. Again, the NYCHRL's definition of a disability is broad. *See* N.Y.C. Admin. Code § 8-102 (defining disability as a "physical . . . impairment," further defined as "[a]n impairment of any system of the body"). As alleged, Ms. Arazi's partner's affliction with COVID-19 significantly impaired his respiratory system, leaving him with "breathing difficulties" requiring the use of "an oxygen machine," TAC ¶ 160—This is not a case about an asymptomatic or mild instance of COVID-19. And indeed, COVID-19 has been recognized as a disability under the NYCHRL. *See Velez v. Girraphic LLC*, No. 20 Civ. 5644, 2021 WL 1873233, at *6 (S.D.N.Y. May 10, 2021) ("[The defendant] contends that the Court should not consider COVID-19 or suspected COVID-19 to be a disability for 'public policy' reasons. . . . But [the defendant] utterly fails to ground this argument in the text of the NYCHRL, which provides an expansive definition of 'disability' to include a 'physical . . . impairment,' defined as '[a]n impairment of any system of the body.' . . . Accordingly, the Court denies [the defendant's] motion to dismiss [the plaintiff's] intentional discrimination claims.").[9]

---

[8] Defendant does not dispute that Plaintiffs sufficiently allege that Ms. Arazi's partner suffered from COVID-19. However, the Court notes that Plaintiffs do not expressly allege that Ms. Arazi's partner tested positive for COVID-19; they allege only that he was tested for COVID-19 and later developed pneumonia and used an oxygen machine. TAC ¶¶ 139, 160. Nonetheless, drawing all inferences in Plaintiffs' favor and given the parties' apparent agreement that Ms. Arazi's partner suffered from COVID-19, the Court reasonably infers that Ms. Arazi's partner suffered from COVID-19.

[9] Defendant presents a frivolous argument that the court should ignore *Velez* because "Plaintiff's employment terminated on March 8, 2021,—before the *Velez* ruling was published . . . ." Reply at 5. The date that *Velez* was issued

Defendant's arguments that a disability cannot be "minor" or "transitory" rely on case law decided under the Americans with Disabilities Act ("ADA").  *See* Mot. at 9–10 (stating "[u]nder federal law, an employee is not 'regarded as' disabled if the impairment that she is regarded as having is both 'transitory and minor' and citing ADA cases in support).  However, as discussed, "[t]he NYSHRL and the NYCHRL define 'disability' more broadly than the ADA," *Rodriguez v. Verizon Telecom*, No. 13-cv-6969, 2014 WL 6807834, at *7 (S.D.N.Y. Dec. 3, 2014).  Thus, whether an impairment is "minor" or "transitory" has no bearing on Plaintiffs' NYCHRL claim for associational disability.

Thus, Plaintiffs sufficiently allege that the case of COVID-19 suffered by Ms. Arazi's partner is a "disability" under the NYCHRL, and have pleaded a claim for associational disability under the NYCHRL based on Ms. Arazi's association with her partner.

### b.  Plaintiffs Sufficiently Plead Whistleblowing under § 740 of the New York Labor Law

Plaintiffs adequately plead a claim for whistleblowing under § 740 of the New York Labor Law.  Section 740 provides that "[a]n employer shall not take any retaliatory personnel action against an employee because such employee . . . discloses or threatens to disclose to a supervisor or to a public body an activity, policy, or practice of the employer that is in violation of law, rule or regulation which violation creates and prevents a substantial and specific danger to the public health or safety." N.Y. Lab. L. § 740.  "The plain language of Section 740 requires that, in order to state a cause of action, 'a plaintiff must allege facts supporting the conclusion that (1) he was subject to a retaliatory personnel action after (2) disclosing to a supervisor (3) a practice of the employer that is in violation of a law, rule, or regulation (4) that creates and presents a substantial and specific danger

---

has no bearing on whether COVID-19 constitutes a disability under the NYCHRL—it is not as if Plaintiff must allege that COVID-19 was legally recognized to be a disability under the NYCHRL prior to her lawsuit in order to bring a claim.  Indeed, Defendant appears to ask that the Court apply the "clearly established right" principle from qualified immunity doctrine to its analysis of disability discrimination under the NYCHRL.  There is no legal basis for doing so.

to the public health or safety.'"  *Klein v. Brookhaven Health Care Facility*, No. CV 17-4841, 2019 WL

1459258, at *9 (E.D.N.Y. Mar. 11, 2019) (quoting *Clarke v. TRW, Inc.*, 921 F. Supp. 927, 933

(N.D.N.Y. 1996)), *report and recommendation adopted*, No. 17-CV-4841, 2019 WL 1458219 (E.D.N.Y.

Mar. 31, 2019).

### 1.   Plaintiffs Adequately Plead that They Were Subject to a Retaliatory Action

To the extent Defendant argues otherwise,[10] Plaintiffs sufficiently plead that they were

subject to retaliatory action.  Under the NYLL, the term "retaliatory action" is defined as

> the discharge, suspension or demotion of an employee, or other adverse employment
> action taken against an employee in the terms and conditions of employment.

N.Y. Lab. Law § 740(1)(e).[11]  That definition is meant to cover a broad category of employer action.

*Cf. Rosario v. Nat'l Hous. P'ship Prop. Mgmt., Inc.*, No. 96 CIV. 4633, 1998 WL 146207, at *3 (S.D.N.Y.

Mar. 26, 1998) (commenting that the statute is intended to ensure that employers cannot use

measures other than the expressly listed retaliatory actions to intimidate employees who report

unsafe conditions).

Here, Plaintiffs plead that the Defendants "plac[ed] plaintiffs on furlough and terminat[ed]

their employment thereby depriving them of compensation."  TAC ¶ 243.  That occurred after

---

[10] It is unclear whether Defendant contests that Plaintiffs sufficiently allege retaliatory action.  In their motion, they quip that Plaintiffs have not alleged that Defendant took "adverse action" against them.  *See* Mot. at 13.  However, Defendant follows that statement with arguments regarding whether Defendant violated the Governor's Executive Orders; Defendant advances no substantive arguments related to whether Defendant took retaliatory action against Plaintiffs. *See id.*

[11] The NYLL was amended in 2022 to define a retaliatory action as

> an adverse action taken by an employer or his or her agent to discharge, threaten, penalize, or in
> any other manner discriminate against any employee or former employee exercising his or her
> rights under this section, including (i) adverse employment actions or threats to take such adverse
> employment actions against an employee in the terms of conditions of employment including but
> not limited to discharge, suspension, or demotion; (ii) actions or threats to take such actions that
> would adversely impact a former employee's current or future employment . . . .

N.Y. Lab. Law § 740(1)(e)(2022).

Plaintiffs notified Defendant that its policy of encouraging individuals to return to the office could violate the Executive Orders. Drawing all inferences in favor of Plaintiffs, they sufficiently plead that Defendant's actions impacted the terms and conditions of Plaintiffs' employment because Plaintiffs complained of Defendant's purported violations, and therefore Plaintiffs adequately allege retaliatory action.

### 2. Plaintiffs Sufficiently Plead that Defendant's Response to the Executive Orders Violated those Orders

Plaintiffs also sufficiently plead that Defendant engaged in a practice that violated a law, rule, or regulation.[12] NYLL § 740(1)(c) defines "law, rule or regulation" to "include[e] any duly enacted statute or ordinance or any rule or regulation promulgated pursuant to any federal, state or local statute or ordinance." N.Y. Lab. Law § 740(1)(c). "For pleading purposes, the complaint need not specify the actual law, rule or regulation violated, although it must identify the particular activities, policies or practices in which the employer allegedly engaged, so that the complaint provides the employer with notice of the alleged complained-of conduct." *Webb-Weber v. Cmty. Action for Hum. Servs., Inc.*, 23 N.Y.3d 448, 453 (2014). However, the complaint must "identify the particular activities, policies or practices in which the employer allegedly engaged, so that the complaint provides the employer with notice of the allegedly complained-of conduct." *Id.*

Plaintiffs sufficiently identify the particular activities in which Defendant engaged that would violate the Governor's Executive Orders. On March 17, 2020, Defendant's human resources

---

[12] The parties do not appear to dispute that Plaintiffs sufficiently allege that they disclosed, to a supervisor, Defendant's practices that violated the Governor's Executive Orders. Regardless, the Court notes that Plaintiffs sufficiently allege that they did so. *See* TAC ¶ 148 (alleging that Ms. Hylemon emailed an employee in Defendant's human resources department complaining about Defendant's response to Executive Order 202.8); *id.* ¶ 154 (alleging that Ms. Arazi emailed Mr. Cohen, Mr. Cherniak, and Defendant's human resources department requesting time to work from home in order to "follow the Governor's mandate"); *id.* ¶ 157 (alleging that Ms. Julia communicated to employees in Defendant's human resources department informing them that her job was not listed as essential under the Executive Order, and that she would remain at home).

Neither do the parties dispute that Plaintiffs were retaliated against because they complained about Defendant's failure to comply with the Governor's Executive Orders. But even if they had, Plaintiff's allegations are sufficient, as the Plaintiffs allege that they were the only Cohen employees to be placed on furlough on May 1, 2020. *See* TAC ¶ 174.

department sent an email confirming that the company had "no work from home policies" and that employees would only be permitted to stay home if using "sick, personal, or vacation time" after which point they could remain home without pay. *Id.* ¶ 135. Defendant also introduced carpooling policies to encourage its employees to come to the office. Then, on March 20, 2020, Governor Cuomo issued Executive Order 202.8, which required that nonessential employers "reduce the in-person workforce at any work locations by 100%" and "to the maximum extent possible" utilize telecommuting or work-from-home procedures. *See* N.Y. Exec. Order No. 202.8 (March 20, 2020). Nonetheless, Defendant sent an email stating that it "intended to keep [its] buildings open and operational" and told its employees to "make [their] own decision whether or not to come to work being guided by the time off policies previously advised." TAC ¶ 149. In other words, as alleged, Defendant told its employees that its offices would remain open—in violation of the Executive Order's direction to reduce the in-person workforce by 100%—and tacitly encouraged them to come into work lest they exhaust their sick, personal, or vacation time.

In addition, after Executive Order 202.8 was issued, Defendant's COO allegedly sent its employees "letters for the employee to show the police or any government authority claiming that they were 'essential,' even though they were not." TAC ¶ 152. Defendants do not dispute in their reply that this constitutes a violation of Executive Order 202.8. Thus, Plaintiffs have identified specific conduct that could have violated Executive Order 202.8, and in doing so, have sufficiently pleaded that Defendant violated those orders. *See Villarreal v. Montefiore Med. Ctr.,* No. 20-CV-12, 2020 WL 5518382, at *3 (S.D.N.Y. Sept. 14, 2020) (determining that the plaintiff had sufficiently pleaded a claim under Section 740 because the allegations "suggest[ed] that the treatment plan" for an infant patient "may have constituted professional misconduct under New York Education Law § 6530"); *see also Calabro v. Nassau Univ. Med. Ctr.,* 424 F. Supp. 2d 465, 476 (E.D.N.Y. 2006) (concluding plaintiff had stated a claim where the plaintiff had "alleged uncontested facts that

support at least one actual violation and he has cited with particularity the relevant sections of the New York Health Code that were violated").

Defendant's reliance on *HC2, Inc. v. Delaney*, 510 F. Supp. 3d 86 (S.D.N.Y. 2020), is misplaced. In *HC2*—a case that similarly involves whistleblowing in the early days of the COVID-19 pandemic—a court in this district determined that the plaintiff had failed to state a claim where the plaintiff alleged that, on March 17, 2020, he had complained that his company had allowed certain employees with flu-like systems to come to the office, and also had requested that he be permitted to work from home. *Id.* at 97. There, however, the Court noted that the only Executive Orders that the Governor had issued prior to March 17, 2020 declared a state of emergency and had not been directed toward private employers. *Id.* Here, on the other hand, the Governor's Executive Orders targeted private employers, and Plaintiffs sent Defendant numerous communications notifying Defendant that Plaintiffs believed Defendant's policies conflicted with the Executive Orders after Executive Order 202.8 was issued on March 20, 2020. *See* TAC ¶ 148 (alleging that Ms. Hylemon emailed an employee in Defendant's human resources department complaining about Defendant's response to Executive Order 202.8 after the Order had been issued); *id.* ¶ 154 (alleging that Ms. Arazi emailed Mr. Cohen, Mr. Cherniak, and Defendant's human resources department requesting time to work from home in order to "follow the Governor's mandate"); *id.* ¶ 157 (alleging that Ms. Julia communicated to employees in Defendant's human resources department informing them that her job was not listed as essential under the Executive Order, and that she would remain at home). Accordingly, *HC2* does not impact the Court's analysis.

Moreover, to the extent Defendant maintains that Plaintiffs must plead that Defendant's conduct in fact violated the Executive Orders, Defendant relies on outdated law. In *Webb-Weber*, the New York Court of Appeals expressly rejected the argument that a plaintiff must plead an actual violation of the law:

> To be sure, in order to recover under a Labor Law § 740 theory, the plaintiff has the burden of proving that an actual violation occurred, as opposed to merely establishing that the plaintiff possessed a reasonable belief that a violation occurred. And, the violation must be of the kind that "creates a substantial and specific danger to the public health or safety."  However, for pleading purposes, the complaint need not specify the actual law, rule or regulation violated, although it must identify the particular activities, policies or practices in which the employer allegedly engaged, so that the complaint provides the employer with notice of the alleged complained-of conduct.  To the extent that Appellate Division authority can be read as requiring a plaintiff to plead the actual law, rule or regulation the employer violated, it should no longer be followed for that proposition.

23 N.Y.3d at 452–53.[13]  Thus, because Plaintiffs have identified the specific policies and practices in which Defendant engaged—namely, communicating that the office would remain open and that individuals could to return to the office, despite the Governor's instruction to reduce in-person work by 100%.[14]  In doing so, Plaintiffs' allegations are sufficient to allege that Defendant violated law or public policy.

### 3.   Plaintiffs Sufficiently Allege that Defendant's Violations Created a Substantial and Specific Danger to the Public Health or Safety

Finally, Defendant sufficiently pleads that Defendant's violations of the Governor's Executive Orders created a substantial and specific danger to the public health or safety.  To sufficiently plead this element, plaintiff must allege that the violation is "of the kind that 'creates a substantial and specific danger to the public health or safety.'"  *Id* (*quoting Remba v. Federation Empl. & Guidance Serv.*, 76 N.Y.2d 801, 802 (1990)).  "The statutory language of 'substantial and specific danger to the public health and safety' is not defined in the whistleblower statute."  *Villarin v. Rabbi*

---

[13] Notably, *HC2* appears to have relied, in part, on law that was decided prior to *Webb-Weber*.  *HC2* cites *Barker v. Peconic Landing at Southold, Inc.*, 885 F. Supp. 2d 564, 569–70 (E.D.N.Y. 2012), for the proposition that plaintiffs must "plead and prove that the employer engaged in an activity, policy, or practice that constituted an actual violation of law, rule, or regulation."  *See HC2*, 510 F. Supp. 3d at 96.  Thus, not only is *HC2* inapposite to this case, but its conclusions might rest on a misunderstanding of the appropriate standard for analysis of § 740 claims.

[14] Defendant repeatedly argues that the Executive Orders did not mandate the creation of a work from home policy. But Plaintiffs do not allege that the Executive Orders mandated a work from home policy; rather, they allege that Defendant violated the Executive Order by keeping its offices open and encouraging its employees to return to the office, and by fabricating letters claiming that non-essential employees were, in fact, essential.

*Haskel Lookstein Sch.*, 942 N.Y.S.2d 67, 70 (1st Dep't 2012).  But "[c]ourts have consistently held that the statute addresses only traditional 'public health and safety' concerns."  *Id.*

The Executive Orders were issued in response to, and in order to mitigate, the COVID-19 pandemic.  The Court may reasonably infer that Defendant's violations—which would have had its employees return to a congregate setting where more individuals could be exposed to COVID-19— would create a substantial public health danger.  Indeed, courts have permitted claims to proceed where only one individual would have potentially been impacted, let alone the numerous employees of Defendant.  *See, e.g., Calder v. Planned Cmty. Living, Inc.*, No. 93 CIV. 8882 (AGS), 1995 WL 456400, at *6 (S.D.N.Y. Aug. 2, 1995) (concluding that allegations of single mental health care provider employee's conduct, which included driving at excessive speed while transporting clients and a repeated failure to obtain a New York driver's license, was sufficient to allege a substantial and specific danger to the public health or safety); *Rodgers v. Lenox Hill Hosp.,* 626 N.Y.S.2d 137 (1st Dep't 1995) (determining that a plaintiff who complained of a single incident involving paramedics who erroneously pronounced an individual dead without examining the patient had sufficiently pleaded a claim under § 740).  Here, the violations Plaintiffs allege could have resulted in numerous individuals becoming sick with COVID-19.  That is adequately pleaded to be a substantial and specific public health danger, and Plaintiffs sufficiently plead a whistleblowing claim under NYLL § 740.

### c.  Hostile Work Environment

#### 1.  Ms. Hylemon's NYCHRL Hostile Work Environment Claims Are Not Time Barred

As an initial matter, Ms. Hylemon's claims for hostile work environment under the NYCHRL are not time barred.  Defendant correctly points out that there is a three-year statute of

limitations for claims brought under the NYCHRL.[15]  N.Y.C. Admin. Code § 8-502(d); *Taylor v. City of New York*, 207 F. Supp. 3d 293, 302 (S.D.N.Y. 2016).  However, "[u]nder [the continuing violation] doctrine, 'if a plaintiff has experienced a continuous practice and policy of discrimination, the commencement of the statute of limitations period may be delayed until the last discriminatory act in furtherance of it.'"  *Fitzgerald v. Henderson*, 251 F.3d 345, 359 (2d Cir. 2001) (quoting *Gomes v. Avco Corp.*, 964 F.2d 1330, 1333 (2d Cir. 1992)).  The continuing violation doctrine "applies to claims composed of a series of separate acts that collectively constitute one unlawful practice."  *Gonzalez v. Hasty*, 802 F.3d 212, 220 (2d Cir. 2015) (quotation and brackets omitted); *see also Flores v. United States*, 885 F.3d 119, 122 (2d Cir. 2018) ("[W]hen a plaintiff experiences a continuous practice and policy that violates his or her rights, the commencement of the statute of limitations period may be delayed until the last violation." (quotation and alterations omitted)).

"The continuing violation doctrine thus applies not to discrete unlawful acts, even where those discrete acts are part of a 'serial violation,' but to claims that by their nature accrue only after the plaintiff has been subjected to some threshold amount of mistreatment."  *Hasty*, 802 F.3d at 220 (quoting *Morgan*, 536 U.S. at 114–15) (brackets omitted).[16]  A claim is timely under the continuing violation doctrine "if the plaintiff alleges some non-time-barred acts contributing to the alleged violation."  *Id.* (quotation and alterations omitted).  But "[d]iscrete acts [that] fall outside the limitations period[] cannot be brought within it, even when undertaken pursuant to a general policy

---

[15] In their opposition, Plaintiffs withdraw their NYSHRL hostile work environment claims.  *See* Opp'n at 25.

[16] Although some courts have commented that "there is a split in authority as to whether the narrower continuing violation doctrine established [by the Supreme Court] in *Morgan* applies to NYSHRL claims, . . .  the weight of authority has held that Morgan applies to the NYSHRL."  *Taylor*, 207 F. Supp. 3d at 302 n.5 (S.D.N.Y. 2016) (citations omitted) (collecting cases); *see also Sotomayor v. City of New York*, 862 F. Supp. 2d 226, 250 (E.D.N.Y. 2012) (holding that the "definition of the continuing violations doctrine" established by the Supreme Court in *Morgan* "applies to plaintiff's discrimination claims under state law" (citing *Milani v. Int'l Bus. Machs. Corp., Inc.*, 322 F. Supp. 2d 434, 452 n.32 (S.D.N.Y. 2004)), *aff'd*, 713 F.3d 163 (2d Cir. 2013).

that results in other discrete acts occurring within the limitations period." *Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 157 (2d Cir. 2012).

"The continuing violation doctrine is given a broader construction under the NYCHRL than under Title VII or the NYSHRL." *Grimes-Jenkins v. Consol. Edison Co. of N.Y., Inc.*, No. 16-cv-4897, 2017 WL 2258374, at *9 (S.D.N.Y. May 22, 2017) (citing *Taylor*, 207 F. Supp. 3d at 302), *report and recommendation adopted*, 2017 WL 2709747 (S.D.N.Y. June 22, 2017).  Under the NYCHRL, "[o]therwise time-barred discrete acts can be considered timely 'where specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice.'" *Id.* (quoting *Sotomayor*, 862 F. Supp. 2d at 250, in turn quoting *Fitzgerald v. Henderson*, 251 F.3d 345, 359 (2d Cir. 2001)).

"[D]etermining whether the events comprising the basis for [a] plaintiff's claim are part of a single, continuing course of conduct" is a "fact-intensive" inquiry.  *Drees v. County of Suffolk*, No. 06-cv-3298, 2007 WL 1875623, at *9 (E.D.N.Y. June 27, 2007) (quoting *Allen v. Egan*, 303 F. Supp. 2d 71, 79 (D. Conn. 2004)).  Some courts have thus declined to decide whether the continuing violation doctrine applies at the motion to dismiss phase.  *See Fitchett v. City of New York*, No. 18-cv-8144, 2019 WL 3430726, at *7 (S.D.N.Y. July 30, 2019) (collecting cases); *Goodwine v. City of New York*, No. 15-cv-2868, 2016 WL 3017398, at *5 (S.D.N.Y. May 23, 2016); *see also Bloom v. N.Y.C. Bd. of Educ. Teachers' Ret. Sys. of the City of New York*, No. 00-cv-2728, 2003 WL 1740528, at *9 (S.D.N.Y. Apr. 2, 2003) ("[I]t is possible that [the plaintiff] could demonstrate some discriminatory act that did occur within the statute of limitations, so that his claim would not be time-barred.").

Here, the continuing violations doctrine prevents the Court from dismissing Ms. Hylemon's hostile work environment claims.  First, Plaintiffs allege some conduct that is not time barred: though some of Ms. Hylemon's allegations stem from her period of employment with Mr. Cohen, which ended in March 2016, *see* TAC ¶¶ 72, 78, 80, she also alleges conduct occurring after 2016,

when she worked from Mr. Cherniak.  For instance, Plaintiffs allege that after 2016, Mr. Cherniak "frequently told dirty jokes to Ms. Hylemon" and Mr. Cohen would scream at Ms. Hylemon when she got up from her desk.  *See e.g.*, TAC ¶¶ 81, 94.  At this early stage in the proceedings, when the Court must draw all inferences in Plaintiffs' favor, those allegations are sufficient to allege a continuous course of conduct, such that the continuous violations doctrine does not bar her claims for hostile work environment under the NYCHRL.  *See Akhtar v. Saudia*, No. 19 CV 03763, 2021 WL 1758807, at *9 (S.D.N.Y. May 4, 2021) (determining that the continuing violation doctrine applied where the plaintiff alleged that her supervisor mistreated her, included by excluding her from meetings and failing to investigate her claims, some of which were within the three-year limitations period under the NYSHRL); *Taylor v. City of New York*, 207 F. Supp. 3d 293, 303 (S.D.N.Y. 2016) ("Taylor's claims that the DEP repeatedly failed to hire her on account of her sex, race, color, and national origin" both before and after the limitations period expired amounted to a continuing violation, "rendering the conduct outside the limitations period timely under the NYCHRL.").

### 2. Ms. Hylemon and Ms. Arazi Sufficiently Allege Hostile Work Environment Claims under the NYCHRL

Ms. Hylemon and Ms. Arazi sufficiently plead hostile work environment claims under the NYCHRL.  In order to plead a hostile work environment claim under the NYCHRL, a plaintiff must show that they "have been treated less well than other employees" on the basis of a protected characteristic.  *Mihalik v. Credit Agricole Cheuvreux N. Am. Inc.*, 715 F.3d 102, 110 (2d Cir. 2013); *see also Alvarado v. Nordstrom, Inc.*, 685 F. App'x 4, 8 (2d Cir. 2017).  Thus, at a minimum, a plaintiff must "plead facts tending to show that actions that created the hostile work environment were taken against him *because of* a prohibited factor."  *Williams v. Metro-N. Commuter R.R. Co.*, No. 11 CIV. 7835, 2012 WL 2367049, at *13 (S.D.N.Y. June 20, 2012) (emphasis added).

"[W]hen the same individuals engage in some harassment that is explicitly discriminatory and some that is not, the entire course of conduct is relevant to a hostile work environment claim."

*Rasmy v. Marriott Int'l, Inc.*, 952 F.3d 379, 388 (2d Cir. 2020).  "In a claim of a hostile work environment, the emphasis is on the hostility of the work environment as a whole, not the motivation of one decisionmaker, and liability is 'determined only by looking at all the circumstances.'"  *Id.* at 389 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 17 (1993)).

Here, Plaintiffs' allegations are sufficient—at this early stage in the litigation—to plead that the women were treated less well because of their gender.  Plaintiffs allege, for instance, that Mr. Cherniak frequently told "dirty jokes" to Ms. Hylemon and Ms. Julia, and "came to their desks to make jokes with sexual undertones."  TAC ¶ 94.  Ms. Arazi was approached by Cohen Brothers' employees to discuss Ms. Cohen's references to "blowjobs" for her husband, which "was extremely uncomfortable."  *Id.* ¶ 70.  It is reasonable to infer, from the sexual nature of this behavior, that it was directed toward Plaintiffs because they were women.  *See, e.g., Bermudez v. City of New York*, 783 F. Supp. 2d 560, 588 (S.D.N.Y. 2011) (denying motion to dismiss hostile work environment claim under the NYCHRL regarding "comments," the "majority of [which] were sexual in nature," that made a female coworker uncomfortable); *Pryor v. Jaffe & Asher, LLP*, 992 F. Supp. 2d 252, 261 (S.D.N.Y. 2014) ("Courts have even found that the NYCHRL's requirement of discrimination 'because of' gender can be satisfied by allegations of entirely non-physical work interactions with sexual content or undertones.").  In addition, Ms. Hylemon "witnessed much of the sexual harassment of Ms. Julia," *id.* ¶ 62—and Defendant does not dispute that Plaintiffs have sufficiently pleaded that Ms. Julia was subject to gender-based sexual harassment—by Defendant's employees, and the Court may reasonably infer, at this early stage, that Defendant's employees did so purposefully, *see Rasmy*, 952 F.3d at 389 ("[C]onduct not directly targeted at or spoken to an individual but purposefully taking place in his presence can nevertheless transform his work environment into a hostile or abusive one . . .").  Further, Mr. Cohen would scream, belittle, berate, and humiliate employees, and "in particular, female employees" including Ms. Hylemon and Ms.

Arazi. *Id.* ¶ 72; *see also*, *e.g.*, *id.* ¶ 85 (alleging that Mr. Cohen said "I'm going to kill you" to Ms. Hylemon "many times"); *id.* ¶¶ 73, 77, 80 (requiring Ms. Arazi to stay at her desk at all times and becoming angry with her if she took bathroom breaks).

Given all of those circumstances, it is reasonable to infer that Ms. Arazi and Ms. Hylemon were treated less well because of their gender. *See Lenart v. Coach Inc.,* 131 F. Supp. 3d 61, 69 (S.D.N.Y. 2015) (finding sufficient to state a claim under the NYCHRL allegations that the plaintiff had to "undergo extra interviews and psychological testing, whereas his female colleagues did not," and that he had heard his supervisors express a preference for working with women).

Defendant fails to grasp the procedural posture of this case in arguing that the alleged behavior of Mr. Cohen, Mr. Cherniak, and other of Defendant's employees amount to nothing more than "petty slights and inconveniences." *See* Mot. at 20–21. That is an affirmative defense under the NYCHRL, and it is not apparent on the facts of the complaint. Thus, while Defendant's argument might be proper on summary judgment, it is not in this motion to dismiss. Indeed, Defendant cites *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, where the Court determined:

> [E]ven if the plaintiff establishes that she was treated "less well" because of her gender, defendants may assert "an affirmative defense whereby [they] can still avoid liability if they prove that the conduct complained of consists of nothing more than what a reasonable victim of discrimination would consider 'petty slights and trivial inconveniences.'" . . . As with most affirmative defenses, the employer has the burden of proving the conduct's triviality under the NYCHRL.

715 F.3d 102, 111 (2d Cir. 2013) (second alteration in original) (citations omitted) (quoting *Williams v. N.Y.C. Housing Auth.*, 872 N.Y.S.2d 27, 41 (1st Dep't 2009)). *Mihalik*—an appeal of summary judgment—lays out an affirmative defense for which the Defendant bears the burden of proof. The other cases Defendant cites in support were also decided on summary judgment. *See* Mem. at 21 (citing *Wilson v. N.Y.P. Holdings, Inc.*, No. 05 CIV.10355, 2009 WL 873206, at *1 (S.D.N.Y. Mar. 31, 2009) (deciding summary judgment); *Inman v. City of New York*, No. 08 CV 8239, 2011 WL 4344015,

at *1 (S.D.N.Y. Sept. 13, 2011) (same).  Here, on a motion to dismiss, Plaintiffs' allegations are

sufficient to state a claim for hostile work environment under the NYCHRL. [17]

### d.  Plaintiffs Sufficiently Plead Retaliation under the NYSHRL and NYCHRL

Plaintiffs also sufficiently allege claims for retaliation under the NYSHRL and the

NYCHRL.  The NYSHRL prohibits retaliation "against any person because he or she has opposed

any practices forbidden under this article or because he or she has filed a complaint, testified or

assisted in any proceeding under this article."  N.Y. Exec. Law § 296.  The NYCHRL is materially

identical:  "Section 8-107(7) of the NYCHRL prohibits employers from 'retaliating or discriminating

in any manner against any person because such person has opposed any practice forbidden under

this chapter.'"  *Mihalik*, 715 F.3d at 112 (quoting N.Y.C. Admin. Code § 8-107(7)) (alterations

omitted).

"New York courts have broadly interpreted the NYCHRL's retaliation provisions."  *Id.* at

112 (citing *Albunio v. City of New York*, 16 N.Y.3d 472, 477–78 (2011)).  As to the NYSHRL, as

previously noted, plaintiffs seeking to plead retaliation under the NYSHRL faced a higher burden

than those looking to do so under the NYCHRL prior to the NYSHRL's amendment in 2019.  After

that amendment, the standard for NYSHRL aligns with the NYCHRL standard for claims that

accrued on or after October 11, 2019.  Here, the alleged relation against Plaintiffs—i.e., their being

placed on furlough and their eventual termination—occurred in 2020 and 2021.  Thus, the

NYCHRL's more liberal pleading standard applies.

Accordingly, Plaintiffs must plead that "(1) [they] engaged in a protected activity as that term

is defined under the NYCHRL, (2) [their] employer was aware that [they] participated in such

activity, (3) [their] employer engaged in conduct which was reasonably likely to deter a person from

---

[17] Defendant again confuses the relevant allegations in arguing that Plaintiffs' hostile work environment claims are deficient because "Defendant placed males on furlough as well."  Reply at 8–9.  Plaintiffs' hostile work environment claims concern their treatment in the office—not Defendant's reaction to the COVID-19 pandemic.

engaging in that protected activity, and (4) there is a causal connection between the protected activity and the alleged retaliatory conduct." *Bilitch v. N.Y.C. Health & Hosps. Corp.*, 148 N.Y.S.3d 238, 246 (2nd Dep't 2021); *see also Sanderson-Burgess v. City of New York*, 102 N.Y.S.3d 678, 681 (2nd Dep't 2019); *Warmin v. N.Y.C. Dep't of Educ.*, No. 16-cv-8044, 2019 WL 3409900, at *7 (S.D.N.Y. July 29, 2019) (noting that a plaintiff must allege "that he 'took an action opposing his employer's discrimination, and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action.'" (quoting *Mihalik*, 715 F.3d at 112) (brackets omitted)).

Defendants do not dispute that Plaintiffs sufficiently allege that first, second, and third elements of a claim under the NYCHRL.[18]  Instead, Defendant disputes only (1) whether Plaintiffs have alleged an "adverse action" and (2) whether Plaintiffs sufficiently allege that there was a causal connection between the protected activity and the alleged retaliation.

As to the first, pleading an adverse action is not required to plead retaliation under the NYCHRL.  *See Mihalik*, 715 F.3d at 114 ("[T]he NYCHRL does not require either materially adverse employment actions or severe and pervasive conduct."); *see also Schaper v. Bronx Lebanon Hosp. Ctr.*, 408 F. Supp. 3d 379, 394 (S.D.N.Y. 2019) ("[B]ecause of the NYCHRL's broader scope, a plaintiff is not required to show, 'a material adverse action' under the NYCHRL.").  And though pleading adverse action was required under the pre-2019 version of the NYSHRL, *see Shultz v. Congregation Shearith Israel of City of N.Y.*, 867 F.3d 298, 309 (2d Cir. 2017) (listing "an adverse employment action" as a pleading requirement under the NYSHRL), it ceased to be upon the NYSHRL's

---

[18] Nonetheless, Plaintiffs' allegations are sufficient to satisfy those elements.  Plaintiffs aver that they engaged in protected activity by filing a complaint alleging Defendant discriminated against them under the NYCHRL and NYSHRL, *see* TAC ¶ 181, that Defendant was aware of that lawsuit, *id.* ¶ 182, and that Plaintiffs were then terminated, *id.* ¶ 202.  Filing a complaint is an established protected activity. *See, e.g.*, *Fenner v. News Corp.*, No. 09 CIV. 09832, 2013 WL 6244156, at *27 (S.D.N.Y. Dec. 2, 2013) (determining that "the instant lawsuit" in that case, which alleged discrimination under the NYCHRL, "constitute[d] protected activity").  Nor is there any question that Defendant was aware of this lawsuit or that being terminated from one's employment would reasonably deter someone from complaining of discrimination.

amendment to more closely mirror the standards in the NYCHRL.  Accordingly, whether Plaintiffs plead an adverse action has no bearing on their NYCHRL and NYSHRL claims for retaliation. Regardless, termination is an adverse action under any standard.

Plaintiffs also sufficiently allege a causal connection between the protected conduct and the retaliatory action.  "A causal connection in retaliation claims can be shown either '(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant.'" *Littlejohn v. City of New York*, 795 F.3d 297, 315 (2d Cir. 2015) (quoting *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)).  By Defendant's own telling, Plaintiffs were terminated five months after they filed the complaint in this action.  *See* Mot. at 23.  Five months is within the range recognized in the Second Circuit where a causal connection can be inferred. *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010) ("[F]ive months is not too long to find the causal relationship."); *Rasmy v. Marriott Int'l, Inc.*, 952 F.3d 379, 391 (2d Cir. 2020) (same); *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009) ("[T]he passage of only six months between the dismissal of Espinal's lawsuit and an allegedly retaliatory beating by officers . . . is sufficient to support an inference of a causal connection").  Accordingly, Plaintiffs have sufficiently pleaded a causal connection between filing their lawsuit and being terminated.

Defendant also argues that it can "proffer a legitimate, non-retaliatory, and non-pretextual reason for the end of Plaintiff's employment."  Mot. at 23.  Again, Defendant misapprehends the procedural nature of this motion.  Plainly, that argument is improper on a motion dismiss, where the Court may consider only allegations raised in Plaintiffs' complaint.  *Field Day, LLC v. County of Suffolk*, 463 F.3d 167, 192 (2d Cir. 2006) (remarking that Courts are limited to consider allegations in the complaint in considering a motion to dismiss).

Accordingly, Plaintiffs have sufficiently pleaded a claim for retaliation under the NYSHRL and NYCHRL.

### e. Plaintiffs' Claims for Retaliation under the FLSA and NYLL Are Not Dismissed

Plaintiffs also sufficiently plead retaliation under the FLSA and NYLL. New York Labor Law § 215 provides, in pertinent part, that no employer "shall discharge, threaten, penalize, or in any other manner discriminate against any employee (i) because such employee has made a complaint to his or her employer . . . that the employer has engaged in conduct that the employee, reasonably and in good faith, believes violates any provision of [the Labor Law]." N.Y. Lab. Law § 215; *see also Schmidt-Sarosi v. Offs. For Fertility & Reprod. Med., P.C.*, 150 N.Y.S.3d 75, 78 (1st Dep't 2021). The FLSA similarly provides that it is "unlawful for any person . . . to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under [FLSA]." 29 U.S.C. § 215(a)(3).

"[T]he elements of FLSA and NYLL retaliation claims overlap in all material respects." *Cortese v. Skanska Koch, Inc.*, No. 19-CV-11189, 2021 WL 2472242, at *10 (S.D.N.Y. June 17, 2021). "To establish a prima facie case, the plaintiff must show '(1) participation in protected activity known to the defendant, like the filing of a FLSA lawsuit; (2) adverse employment action [a]ffecting the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action.'" *Id.* (quoting *Mullins v. City of New York*, 626 F.3d 47, 53 (2d Cir. 2010)).

Here, Defendant disputes only whether Plaintiffs have sufficiently pleaded that they were subject to adverse action. Plaintiffs adequately plead that element. They allege that they were terminated from their employment in 2021, and termination is an adverse action for purposes of FLSA and NYLL retaliation claims. *See e.g.*, *Moses v. Griffin Indus., LLC*, 369 F. Supp. 3d 538, 546 (S.D.N.Y. 2019) (determining that some of the plaintiffs stated a claim for FLSA retaliation after they were terminated by the defendant); *Callender v. Panabori Food Corp.*, No. 16cv7152, 2018 WL

4565876, *6 (S.D.N.Y. July 11, 2018) (commenting that termination can serve as the basis for claims of retaliation under both the NYLL and the FLSA), *report and recommendation adopted*, 2018 WL 3728931 (Aug. 6, 2018).

Still, Defendant argues that Plaintiffs did not suffer adverse action because Cohen Brothers made them an offer to resume working in the office. *See* Mot. at 24.  That argument appears to be premised on the notion that Plaintiffs voluntarily chose not to return to Cohen Brothers.[19] However, as alleged, Plaintiffs were terminated when they "had all indicated they were not refusing the offers and were still trying to get answers to their questions." TAC ¶ 202.  Thus, Plaintiffs do not allege that they willingly chose to leave their positions at Cohen Brothers; at a minimum, issues of fact preclude a determination that Plaintiffs "voluntarily" left their employment with Defendant. Accordingly, the Court will not dismiss Plaintiffs' claims of retaliation under the NYLL and FLSA.

## V.  LEAVE TO AMEND

The Court denies Plaintiffs leave to amend their complaint because further amendment would be futile.  "It is the usual practice upon granting a motion to dismiss to allow leave to replead."  *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991)); *see also* Fed. R. Civ. P. 15(a)(2)  However, "[a] plaintiff need not be given leave to amend if it fails to specify either to the district court or to the court of appeals how amendment would cure the pleading deficiencies in its complaint."  *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014); *see also Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (holding that where the "problem with [a complaint] is substantive [and] better pleading will not cure it," leave to amend should be denied as futile).

---

[19] Indeed, the only case upon which Defendant relies concerned plaintiffs who undisputedly "tendered letters of resignation before the filing of [that] action."  *Ayres v. 127 Rest. Corp.*, 12 F. Supp. 2d 305, 311 (S.D.N.Y. 1998).

Here, the only dismissed claim is Ms. Arazi's claim for associational disability.  Associational disability claims are not cognizable under the NYSHRL.  Thus, any attempt to amend the complaint would be futile.

## VI. CONCLUSION

For the reasons herein, Defendant's motion to dismiss is denied except for Ms. Arazi's claim for associational disability under the NYSHRL.

The Clerk of Court is directed to terminate the motion pending at Dkt. No. 43.

SO ORDERED.

Dated:  March 28, 2022
New York, New York

_____
GREGORY H. WOODS
United States District Judge